Kyriaki Cleo **KYRIAZI**, Plaintiff,

v.

**WESTERN ELECTRIC COMPANY** et al., Defendants.

Civ. A. No. 475–73.

United States District Court, D. New Jersey.

Oct. 30, 1978.

Vladeck, Elias, Vladeck & Lewis by Judith P. Vladeck, Margaret M. Young, New York City, for plaintiff.

Pitney, Hardin & Kipp by Edward P. Lynch, S. Joseph Fortunato, Barry A. Guryan, Claire B. Dubin, Morristown, N. J., for defendants.

## OPINION

STERN, District Judge.

## I. INTRODUCTION AND SUMMARY OF COURT'S FINDINGS

This is a class action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. The named plaintiff, Kyriaki Cleo Kyriazi ("Kyriazi"), charges defendant Western Electric Co. ("Western") with across-the-board sex-based discrimination with respect to virtually every condition of employment at its Kearny plant. Kyriazi also alleges that she herself was the victim of sex discrimination at Western in a number of respects. The

issue of liability having been severed from that of damages, the case was tried on the liability issue alone commencing July 7, 1977 and concluding on December 1, 1977.

The Court, having heard the testimony at trial and having reviewed the voluminous exhibits submitted by the parties, finds that Western systematically denied women the employment opportunities it afforded men in the areas of hiring, promotion, and participation in training programs; that it slotted women initially into the lower-paying "women's jobs" and laid them off in disproportionate numbers in times of economic stress. This was proved through statistical evidence, never rebutted by the defendant, and through other evidence of purposeful discrimination.

In addition, the Court finds that Kyriazi is an adequate representative of the class, and that, as such, she may appropriately challenge Western's employment practices. Finally, the Court, having considered Kyriazi's individual case, finds that she was underrated, underpaid, and denied promotional opportunities by Western because of her sex; that she was harassed by her male co-workers; and that she was terminated on account of her sex and in retaliation for having lodged a complaint of sex discrimination.

## II. PRELIMINARY ISSUES

### A. Jurisdiction

The Court has jurisdiction over this action under 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(1). Timely charges of discrimination were lodged with the New Jersey Department on Civil Rights and with the EEOC, which found reasonable cause to believe there was discrimination against Kyriazi and all women employed at Western's Kearny plant. (P–161). Pendent jurisdiction exists over the tort claims against the individual defendants.[1]

---

1. See, United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There is subject matter jurisdiction over Kyriazi's state law claims because federal claims are also leveled against these same individuals under 42 U.S.C. § 1985(3). See Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

### B. Parties

Plaintiff Kyriazi was hired by Western in 1965 as a professional in the Information Systems (computer) field at Western's New York Headquarters. In February 1966 she was transferred into the Industrial Engineering organization at Western's Kearny plant. She was promoted to the position of Industrial Engineer in May 1967 and transferred in February 1969 into the Information Systems organization at Kearny. She was terminated by Western on November 19, 1971.

Kyriazi claims that (1) Western denied her promotions and gave her lower ratings and a lower salary than she deserved on account of her sex, in violation of 42 U.S.C. § 2000e–2(a); (2) that she was terminated by Western on account of her sex, in violation of 42 U.S.C. § 2000e–2(a); (3) that she was terminated by Western in retaliation for having filed formal charges against it, in violation of 42 U.S.C. § 2000e–3(a); (4) that Western and the five individual defendants conspired to deprive her of federally-protected rights, in violation of 42 U.S.C. § 1985(3); and (5) that the five individual defendants are liable under state law for having tortiously interfered with her employment at Western.

Defendant Western, an "employer" within the meaning of 42 U.S.C. § 2000e(b), is engaged in the manufacture of telephone equipment. Western's Kearny Works Organization consists of a main facility, the Kearny plant, and a satellite location, the Clark Shops. The main facility manufactures exchange area and video pair cable, key equipment, PBX's switchboards, amplifiers for undersea cable, and transmission apparatus for the Bell System (Exhibit P–77; Introduction). The Clark Shops manufacture submarine cable repeaters for the United States Government (Exhibit P–77) and for the telephone company (Malina, 43: 5335–6) (Hobbie, Tr. 197).

The five named individual defendants are Fred Wilser, Kyriazi's supervisor during her tenure at the Information Systems department in Kearny; Ralph Boyd, who supervised a department of the Information Systems professionals during the period in which Kyriazi was physically located there; and Kyriazi's male co-workers in Information Systems: James Snyder, Robert Armstrong and Shen T. Liu.

### C. Scope of Class and Class Claims

By order dated July 16, 1975, the Court certified the class to encompass:

> all females who are now or at any time since June 9, 1971, have been employed by defendant Western Electric Company, or who sought employment with said Company during the pendency of this suit, at the Kearny works organization.

On behalf of this class, Kyriazi contends that women have been discriminated against in the areas of (1) Hiring, (2) Promotion, (3) Transfer, (4) Layoff, (5) Discharge, (6) Maternity Leave, (7) Tuition refund benefits, (8) Participation in the Bell Systems Savings Plan, (9) Participation in training programs, and (10) Opportunities for testing.

### D. Kyriazi's EEOC Charge and its Effect on Class Membership.

As a prerequisite to suit under Title VII, timely charges must be filed with both the state agency and with the EEOC. 42 U.S.C. § 2000e–5(e). Where a named plaintiff in a class action has complied with these requirements, he or she may represent a class composed of all those who could have filed charges of discrimination as of the date on which the named plaintiff filed her charge. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3rd Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

Kyriazi filed two charges of discrimination with the EEOC; an unsworn charge dated January 7, 1972 (P–161) and a sworn charge dated September 11, 1972 (D–79B).[2]

---

**2.** The text of both charges is identical. It reads:

"DEGREES: (1) MS. GRAD. SCHOOL OF ENGINEERING (2) M.B.A. GRADUAT.

Western argues that the Court should credit only the latter charge, thus limiting class membership to all women who could have filed charges as of November 15, 1971, that is, 300 days before September 11, 1972.[3]

The Court, in accordance with its earlier order certifying the class, credits Kyriazi's first charge with the EEOC filed January 7, 1972, thereby allowing her to represent a class of women who had viable claims of discrimination within 210 days of that date, or June 9, 1971. For it is by now well-settled law that unsworn, unserved charges are effective on the date filed. *See, e. g., Georgia Power Co. v. EEOC,* 412 F.2d 462 (5th Cir. 1969); *Choate v. Caterpillar Tractor Co.,* 402 F.2d 357 (7th Cir. 1968). In balancing the possible prejudice to each side, we find that selection of the earlier date affects only the measure of defendant's damages—not its liability—while selection of the latter date would preclude relief to women who were deliberately denied their federally-guaranteed right to equal employment opportunities. Accordingly, the Court adheres to its order certifying the class and holds that the class consists of all women who had viable claims of discrimination as of June 9, 1971.

Western argues further that the class claims should be limited to those asserted by Kyriazi in her EEOC charge.

(Def's Pr. Finding No. 25). It is clear, however, that a Title VII named plaintiff may raise not only his or her own claims, but also those "growing out of such allegations during the pendency of the case before the Commission." *King v. Georgia Power Co.,* 295 F.Supp. 943, 947 (N.D.Ga. 1968). *See also, e. g., EEOC v. General Electric,* 532 F.2d 359, 368–9 (4th Cir. 1976); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970).

### E. Actionable Period

We next address the question of the time period for which Western may be held liable. Western argues that it may be held liable only for those acts of discrimination which occurred within the 210 days before Kyriazi filed her charge with the EEOC, and that claims arising prior to that date are time-barred. Plaintiff argues that while class membership is governed by this date, class members may secure remedies for acts of discrimination occurring back to July 2, 1965 (the effective date of Title VII) or the date of their hire, whichever is later, because Western has engaged in a "continuing violation" of Title VII.

The "continuing violation" theory permits a Title VII plaintiff to challenge an employment practice even if all the acts of

SCHOOL OF BUSINESS BOTH OF COLUMBIA UNIV. SERVICE: HIRED AS AN ENGINEER IN 1965, TOTAL SERVICE 7 YEARS (1965–NOV. 1971) PERFORMANCE: THEORETICAL & PRACTICAL APPLICATIONS EXCELLENT, RELATIONSHIP WITH 99.999% OF THE CO. EXCELLENT TILL TODAY, THE 5 YEARS OUT OF THE TOTAL 7 (APPROX.) MUTUAL RESPECT COMPLAINTS:

UPON TRANSFER TO A NEW ORGANIZATION AT APPROX. THE 5TH YEAR OF SERVICE I FACED EXTREME CALCULATED (SEX) DISCRIMINATORY PRACTICES, 1. PROFESSIONALLY: IN THE ASSIGNMENT OF WORK (PROJECTS ME TO DEVELOP), APPLICATION OF UNETHICAL PROFESSIONAL PRACTICES AND REFUSAL OF COOPERATION COMPLETELY IGNORING MY INTERESTS IN RATING, SALARY INCREASES, AND PROMOTIONS, RE-

SULT: FINANCIAL LOSS HUMILIATION AND LOST OPPORTUNITIES FOR PROMOTION TO SENIOR ENGINEER. 2. PERSONALLY: HARASSMENT, REACHING PROPORTIONS OF IMMORALITY, GENERALLY CALCULATED ADTION [sic] TO ALTER (TO THE WORST) MY EXCELLENT PROFESSIONAL AND PERSONAL IMAGE IN THE CO. REPRISAL: WHEN THEY WERE INFORMED THAT I FILED A SUIT AGAINST THE CO. (WITH THE N.J. STATE), THEY TERMINATED MY EMPLOYMENT . . . . .

**3.** Prior to March 24, 1972, and pursuant to 42 U.S.C. § 2000e–5(d) an individual in a state which had enacted anti-discrimination laws had a period of 210 days (as opposed to 90 days in states without such laws) to file charges of discrimination with the EEOC. Effective March 24, 1972, this period was extended to 300 days.

discrimination alleged did not occur within the EEOC filing period. This is so because where an employer has regularly and systematically discriminated against a class it will often be impossible to isolate specific acts of discrimination occurring within the filing period. *See generally,* Barbara Lindemann Schlei and Paul Grossman, *Employment Discrimination Law,* 884–908 (1976). This theory serves a number of different purposes; for example, it permits a plaintiff to challenge a practice without the necessity of alleging that he or she is presently affected by it, *see e. g., Bartmess v. Drewrys USA Inc.,* 444 F.2d 1186 (7th Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971) (female employee challenging system which forced women to retire earlier than men did not have to await her own retirement to file EEOC charge); *Wetzel v. Liberty Mutual, supra* (system of segregating females into certain jobs may be challenged at any time). It also permits a Title VII plaintiff to seek redress for acts of discrimination occurring *prior* to the EEOC filing period, for, as the Court of Appeals for the Tenth Circuit has noted, the short EEOC filing period "looms inconsequential" in the face of a practice which regularly discriminates against a class. *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 348 (10th Cir. 1975). *See also, Kohn v. Royall, Koegel & Wells,* 59 F.R.D. 515 (S.D.N.Y.1973), *appeal dismissed,* 496 F.2d 1094 (2nd Cir. 1974) (charge timely even though no applications made within 180 day filing period).

Defendant argues that the Supreme Court's recent decision in *Evans v. United Airlines,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) abrogates the "continuing violation" theory. We disagree.

In *Evans,* the plaintiff had been forced to resign in 1968 from her position as a stewardess because of her employer's *then* prevailing no-marriage policy. That policy had been eliminated when the plaintiff resumed her employment in 1972. More than a year later she challenged her lessened seniority which, she contended, was the direct result of the discriminatory policy which prevailed in 1968. The Court held that since she did not make a timely charge in 1968, she could not now challenge the practice because at present she suffered no more than the present effects of past discrimination.

It is clear to this Court that *Evans* does not overrule the "continuing violation" theory of Title VII. For, as the Supreme Court was careful to point out in *Evans,* the only employment practice which presently existed was the seniority system, which, while it had an adverse impact on the plaintiff to the extent that it perpetrated the effects of *past* discrimination, was itself non-discriminatory. Thus, no *present* continuing violation existed:

> Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists.

*Id.,* at 558, 97 S.Ct. at 1889 (Emphasis in original). Here, by contrast, we deal with an employment practice which *did* constitute a violation of Title VII *as of the time the EEOC charges were filed.*[4]

■ Accordingly, because plaintiff has alleged and proved a "continuing violation" of Title VII as of the time the EEOC charges were filed, any woman who had a claim against Western as of June 9, 1971 may secure relief for acts of discrimination

---

4. We are bolstered in our view that *Evans* did not overrule the "continuing violation" theory of Title VII by the Supreme Court's decision in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), decided the same day as *Evans.* In that case, although the Court did not specifically address the "continuing violation" theory, it did approve the award of retroactive seniority back to the effective date of Title VII to class members who were denied the right to transfer to the position of "line driver".

which occurred from July 2, 1965, the effective date of Title VII, to the present.

■ Kyriazi's claims against Western and the five individual defendants under 42 U.S.C. § 1985(3) will be governed by New Jersey's six year statute of limitations applicable to actions for breach of contract and injury to property, N.J.S.A. 2A:14–1, see, Davis v. United States Steel Supply, 581 F.2d 335 (3rd Cir., 1978), as will Kyriazi's tort claims against the five individual defendants.

## III. SUMMARY OF PLAINTIFF'S PRIMA FACIE CASE

■ It is by now axiomatic that a Title VII plaintiff has the initial burden of offering evidence adequate to create an inference that the employer has engaged in a pattern and practice of discrimination directed at the class. In a "disparate treatment" case, the plaintiff must show—if only through circumstantial evidence—a discriminatory motive or intent on the part of the employer; in a "disparate impact" case, the plaintiff must show that facially neutral practices, while "fair in form" are "discriminatory in operation." [5] Once this initial burden is discharged, the burden then shifts to the employer to provide a non-discriminatory explanation for its practices. See, International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See generally, Schlei & Grossman, supra, at 1147–96; George Cooper, Harriet Rabb & Howard Rubin, Fair Employment Litigation, 64–130 (1975).

■ The Supreme Court has recently made clear that a prima facie case may be made on statistics alone, albeit that the reliability of those statistics depends on all the surrounding facts and circumstances. See, Teamsters, supra, at 339–340.

■ Here we are satisfied that plaintiff has met her burden based on statistics alone. She has shown through statistical evidence, discussed more fully hereafter, (1) that women are disproportionately clustered into the lowest graded jobs at Western; (2) that women are hired initially in disproportionate numbers into the lowest grades; (3) that women are promoted in fewer numbers and with less frequency than men; (4) that women are completely foreclosed from participating in job programs which would help them ascend from the low ranks; and (5) that women were laid off in far greater numbers than men.

This is not, however, merely a "statistical" case. In addition to an overwhelming amount of highly relevant statistical evidence, itself sufficient to sustain her burden, plaintiff has brought these statistics to life with direct evidence that supervisors on every level at Western intentionally discriminated against women on a plant-wide basis. This evidence includes the use of discriminatory advertising for hire and personnel requisition forms which permitted Western's supervisors to designate their sex preference for a position. Such evidence of discriminatory purpose removes any question that the statistical disparities proved by the plaintiff arose merely as a matter of chance.

We turn first to plaintiff's statistical case.

## IV. DISTRIBUTION OF MEN AND WOMEN WITHIN WESTERN'S WORKFORCE AT KEARNY

Women have comprised between 33 and 39% of Western's workforce during the relevant period. Nevertheless, as plaintiff's statistical proofs reveal, females are virtually excluded from the highest level posi-

---

**5.** While plaintiff has not clearly elected the theory under which she proceeds, the Court characterizes this action as a "disparate treatment" case.

tions while they swell the ranks of the lowest clerical and operative grades. Thus, for example, plaintiff's proofs demonstrate that as of January 1, 1975:

1. There were 735 employees within the EEO category denominated "Officers and Managers", which encompasses supervisory positions at Western.[6] Only 1.9% of this group was female. Even within that small percentage, no women held a position above that of section chief, the lowest level of supervision. (Hobbie, 2: 230; Exhibits P–77; P–11; D–204, Tab 1974).

2. There were 545 employees within the "Professional" category, which includes such diverse occupations as Engineer and Information Systems Staff member. 93.2% of this group was male. The female professionals who made up the remaining 6.8% included secretaries and nurses. (Exhibits P–77; P–11; D–204, Tab 1975).

3. There were 426 employees within the "Technical" category, which includes the positions of Engineering Associate, Information Associate and lab technician. 97.7% of this group was male. (Exhibits P–77, D–204; Hobbie, 2:234).

4. There were 1946 employees within the Office and Clerical category, 66% of whom were women. There were 6283 employees in the Operative category "30" series, 46.6% of whom were women, and there were 456 employees in the Operative-Laboratory Technician "600" series, 94.7% of whom were female. Within those percentages we find women clustered primarily in the lowest grades of each category of employees: (Plaintiff's Proposed Findings of Fact, 11 a, b, c).

a) The Clerical category is divided into the "200" and the "500" series. The "200" series is graded from grade 202 to grade 212; grades within the "500" series run from grade 503 to grade 512. The distribution of men and women was as follows:

| 200 SERIES | | 500 SERIES | |
|---|---|---|---|
| Grade | % Female | Grade | % Female |
| 202 | 81 | 503 | 100 |
| 203 | 92.7 | 504 | 100 |
| 204 | 95.4 | 505 | 100 |
| 205 | 83.1 | 506 | 94 |
| 206 | 82.3 | 507 | 86 |
| 207 | 75.8 | 508 | 57 |
| 208 | 59.6 | 509 | 50 |
| 209 | 34.7 | 510 | 40 |
| 210 | 39.1 | 511 | 25 |
| 211 | 21.9 | 512 | 10 |
| 212 | 8.9 | | |

(Exhibits P–77; P–20)　　　　(Exhibit P–28)

b) The "operative" category encompasses jobs which deal directly with the manufacturing process, such as assembler and drill press operator. This category is divided into the "30" series, running from grade 32 to grade 39, and the "600" series (covering laboratory technicians in the Clark Shops) which runs from grade 611 to grade 691. The distribution of men and women within these grades was as follows:

**30 Series**

| GRADE | NO. IN GRADE | % FEMALES IN GRADE |
|---|---|---|
| 32 | 1,974 | 90.0 |
| 33 | 1,108 | 62.0 |
| 34 | 1,303 | 28.0 |
| 35 | 891 | 8.0 |
| 36 | 700 | 1.3 |
| 37 | 305 | 1.6 |

(Exhibits P–22; P–77) (January 1, 1975)

**600 Series**

| GRADE | NO. IN GRADE | % FEMALES IN GRADE |
|---|---|---|
| 611 | 18 | 89 |
| 621 | 56 | 100 |
| 631 | 113 | 46 |
| 641 | 85 | 68 |
| 651 | 55 | 58 |
| 661 | 73 | 13 |
| 671 | 40 | 08 |
| 681 | 5 | 00 |
| 691 | 11 | 00 |

(Exhibit P–23) (January 1, 1975)

c) In addition, plaintiff's proofs suggest that so-called "female jobs" are graded more strictly than so-called "male jobs":

---

6. Personnel at Kearny are divided for EEO purposes into six broad categories: (1) Officials and Managers; (2) Professionals; (3) Technicals; (4) Skilled Crafts; (5) Clericals, and (6) Operatives.

## "MALE JOBS"

Draftsman (Grade 203) (47 males and 2 females hired between 1967 and 1976.) (P–74)

### Job Prerequisites:

No prior experience
– ¾ of 4 month mechanical training course.
(D–175(a), (b))

- - - - - - -

Staff Chauffeur (Grade 508) (filled only by males between 1967 and 1976) (D–204) (Exh. D–177).

### Job Responsibility:

No responsibility for work of others. Must "[o]perate limousines, passenger cars and station wagons to provide transportation for company executives . . . and keep limousines clean."

## "FEMALE JOBS"

Clerk Typist (Grade 203) (133 females and no males) (P–74)

### Job Prerequisites:

Requires 2 months or 4 months prior experience *and* typing skills. (D–175(a), (b))

Other grade 203 level jobs into which only females are hired (teletype operators, calculating machine operator) require prior experience. (D–175(a), (b))

- - - - - - -

Telephone Overseer (Grade 508) (filled exclusively by females) (D–204) (Exh. D–177).

### Job Responsibility:

Supervisory in nature; trains and supervises operators; maintains directory and information files.

Assistant Telephone Overseer (Grade 507) (exclusively female) must: "oversee and coordinate all operating activities of the Works Telephone Exchange . . . assign work schedules, instruct telephone personnel, recommend revisions and improvements for optimum service and savings, handle incidents of urgent or critical natures such as crank calls or bomb threats requiring extensive reasoning to ascertain between valid or invalid emergencies, etc. Reports must be maintained and/or compiled on a wide variety of topics including special studies and summaries relating to telephone service operational activities with associated comparisons and analyses."

5. The skewed distribution of women into the lowest grades and occupations at Western is given visual dimension in the following graphs:

1975 WORK FORCE COMPOSITION BY SEX AND JOB CATEGORY
Source: 1975 AAP "Work Force Analysis" (GN-11-166)

| OFFICERS & MANAGERS | PROFESSIONALS* | TECHNICIANS | CRAFTWORKERS |
|---|---|---|---|
| Male 98.1% / Female 1.9% | Female 6.9% / Male 93.1% | Female 2.3% / Male 97.7% | Male 100% |
| 735 Employees | 545 Employees | 426 Employees | 897 Employees |

OPERATIVES-MANUFACTURING GRADES

| ALL GRADES | 2 HIGHEST GRADES (36.37) | 2 LOWEST GRADES (32.33) |
|---|---|---|
| Male 53.4% / Female 46.6% | Male 98.6% / Female 1.4% | Male 19.8% / Female 80.2% |
| 6,283 Employees | 1,005 Employees | 3,083 Employees |

OPERATIVES-LAB TECHNICIANS

| ALL GRADES | 3 HIGHEST GRADES (671,681,691) | 2 LOWEST GRADES (611,621) |
|---|---|---|
| Male 50.2% / Female 49.8% | Male 94.6% / Female 5.4% | Male 2.7% / Female 97.3% |
| 456 Employees | 56 Employees | 74 Employees |

OFFICE & CLERICAL EMPLOYEES

| ALL GRADES | 3 HIGHEST GRADES (211,212,U) | 4 LOWEST GRADES (202,203,204,205) |
|---|---|---|
| Male 33.0% / Female 66.0% | Male 83.6% / Female 16.4% | Male 10.1% / Female 89.9% |
| 1,946 Employees | 214 Employees | 740 Employees |

SERVICE WORKERS

| ALL GRADES | 5 HIGHEST GRADES (35,36,37,38,39) | LOWEST GRADE (32) |
|---|---|---|
| Male 83.4% / Female 16.6% | Male 97.7% / Female 2.3% | Male 9.7% / Female 90.3% |
| 253 Employees | 86 Employees | 31 Employees |

* "Professionals" category includes 2 all-female job classifications: nurses (11 employees) and executive secretaries ( 7 employees)

(Exhibit P-11)

## V. HIRING PRACTICES AT WESTERN

■ It is Western's policy to promote from within. Thus, the bulk of Western's hiring is done at the lowest levels, while higher-graded positions are filled almost exclusively from Western's own workforce. (Vines, 11: 1100–11; Hobbie, 2: 340–1, 44: 5368). Nevertheless, Western argues that plaintiff has failed to delineate the relevant labor pool, both for purposes of hiring and promotion. It is clear, however, given Western's promote-from-within policy, that the relevant labor pool for purposes of promotion is Western's own workforce. *See*, Cooper, Rabb & Rubin, *supra*, at 84–5:

[There] are situations in which the employer's own conduct can be said to have defined the labor pool. For example, in choosing persons for higher level jobs many employers follow a practice of promoting from within, and the pool of persons in entry level jobs is the pool for promotion . . . [W]here there are substantial percentages [of minorities] in the entry level pool and many fewer at

upper levels, there is a statistical disparity.

Moreover, since the entry level positions at Western require virtually no qualifications, and since it is plaintiff's claim that women are initially hired into lower grades than men, it is clear that the relevant labor pool for purposes of hiring are the employees whom Western actually hired. *Cf., Wetzel v. Liberty Mutual, supra,* (comparing sex composition of "claims adjusters" and "claims representatives" which have similar requirements.)

We turn now to plaintiff's statistics on Western's hiring practices.

Grade 32 and 33 jobs have no requirements of skill, education or experience.[7] (Exhibit P–15). Nevertheless, during the period from 1967–1976, of a total of 1,664 men and 2,103 women hired for grade 32 or 33 positions, *97.5% of the women were hired at grade 32 while only 47% of the men were hired at grade 32.* (Exhibit P–14). In operative jobs requiring no prior experience, virtually all the women were hired into grade 32, while in many of the job categories, grade 33 hires were exclusively men:

HIRING FOR JOBS WITH OPERATIVES AT BOTH GRADES 32 AND 33 WHERE NO EXPERIENCE IS NECESSARY, 1967–1976

| JOB | GRADE | MEN HIRED | % | WOMEN HIRED | % |
|---|---|---|---|---|---|
| Selector | 32 | 17 | 94.5 | 2 | 100 |
| | 33 | 1 | 5.5 | 0 | 0 |
| Bench Hand | 32 | 174 | 93.5 | 490 | 100 |
| | 33 | 12 | 6.5 | 0 | 0 |
| Cleaner | ■ | ■ | ■ | ■ | ■ |
| | 33 | 331 | 100.0 | 0 | 0 |

7. There are, however, significant differences between these two grades in terms of salary, promotion and, most importantly, layoff. As will be discussed in greater detail *infra*, the collective bargaining agreements in effect during the relevant period provided for layoffs *by grade,* so that, for example, a grade 32 worker with twenty years seniority would be laid off before a grade 33 worker with two years seniority.

| JOB | GRADE | MEN HIRED | % | WOMEN HIRED | % |
|-----|-------|-----------|---|-------------|---|
| Inspector | 32 | 7 | 17.0 | 24 | 58.5 |
| | 33 | 35 | 83.0 | 17 | 41.5 |
| Process Checker | 32 | 8 | 73.0 | 41 | 100 |
| | 33 | 3 | 27.0 | 0 | 0 |
| Floor Hand | 32 | 11 | 65.0 | 0 | 0 |
| | 33 | 6 | 35.0 | 0 | 0 |
| Assembler | 32 | 197 | 90.0 | 487 | 99.4 |
| | 33 | 21 | 10.0 | 3 | .6 |
| Tester | 32 | 7 | 64.0 | 9 | 90.0 |
| | 33 | 4 | 36 | 1 | 10.0 |
| Totals | 32 | 422 | 50.5% | 1,053 | 98% |
| | 33 | 413 | 49.5% | 21 | 2% |

(Exhibit P-15, covering 1967–1976 period.)

Grade 32, the lowest grade for operatives, and grades 202 and 203, the lowest grades for clericals, are the three lowest grades at Western. (Exhibit P–12). *84.9% of all women hired by Western between January 1967 and April 1976 were placed in one of these three grades.* (Exhibit P–45). More specifically, of the 3,755 women hired by Western during this time period:

—55.7% were hired at Grade 32

—27.0% were hired at Grades 202 or 203

—6.7% were hired at Grade A01 (Newark Shop Trainee)

—2.1% were hired at Grade 503

(Exhibit P–45). In sharp contrast, *only 27.5% of the men hired by Western during the same time period were hired into the three lowest grades,*

—17.3% were hired at Grade 32

—10.2% were hired at Grades 202 or 203

(Exhibit P–45).

This sex-segregation of jobs is dramatically summed up by the following statistic: *For the period 1967–1976, there were 141 jobs at Western into which only males were hired and 47 jobs into which only females were hired.* (Exhibits P–16, P–46).

Finally although Western rarely fills its higher-graded positions through hire, when it does so, it awards them almost exclusively to men:

| Group | No. of Males Hired | No. of Females Hired |
|-------|--------------------|----------------------|
| Clerical (grade 208/508 or above) | 54 | 8 |

| Group | No. of Males Hired | No. of Females Hired |
|---|---|---|
| Clark Shops Laboratory Technician (above grade 631) | 55 | 0 |
| Engineering Associates | 167 | 4 |
| Occupational Engineers | 12 | 1 |
| Senior Engineers | 3 | 0 |
| Information Systems Staff Members | 72 | 15 |
| ANSE–II category | 15 | 2 |

(Exhibit P–74, covering period from 1967–1976).

## VI. PROMOTION PRACTICES AT WESTERN

As noted earlier, employees hired into the lowest entry jobs can advance by promotion or upgrade to the highest level jobs at Western; that is Western's policy. Thus, an employee hired as a grade 32 operative can progress not only to the highest operative grade, but also to a position in management, or in the professional, technical or craft levels. Indeed, the Court was struck by the fact that many of Western's employees who testified at trial had themselves been promoted from shop or clerical grades to professional or management levels. (Bridges, 16: 1635–9; Kubicki, 15: 1530–33; Marca, 27: 3317–18; Day, 46: 5617; Murath, 16: 1715).

We begin with a labor pool which, as we have already held, is composed of Western's own workforce. During the relevant period between 33 and 39% of this pool was female. However, as plaintiff's statistics demonstrate, that portion of the workforce remained primarily in the lowest positions within each job category and department, while promotional opportunities at each step of the ladder, from the lowest rungs to the steps within supervision itself, were afforded almost exclusively to the favored 61 to 67% of the workforce population.

Thus, for example, within the Officials and Managers category, which encompasses Western's supervisory personnel, no woman has ever been promoted above the lowest level, that of section chief. Indeed, no woman has ever held a position above that level, whether by promotion or otherwise. Men have held such positions in large numbers: between 96 and 220 in the position of department chief, the second lowest position; between 36 and 85 in the three highest supervisory positions of assistant manager, director and general manager. (Exhibits D–204, 1967–76).

To the extent that women have been promoted to the position of section chief, this has been done in small numbers. Thus, during the 1967–76 period, the number of male as compared to female section chiefs was as follows:

| Year | No. Male Section Chiefs | No. Female Section Chiefs | % Section Chiefs Who Were Female |
|---|---|---|---|
| 1967 | 642 | 9 | 1.38 |
| 1968 | 639 | 8 | 1.23 |
| 1969 | 655 | 8 | 1.20 |
| 1970 | 612 | 10 | 1.60 |
| 1971 | 599 | 10 | 1.64 |
| 1972 | 544 | 10 | 1.77 |
| 1973 | 530 | 13 | 2.39 |
| 1974 | 501 | 13 | 2.80 |
| 1975 | 485 | 14 | 2.80 |
| 1976 | 325 | 9 | 2.49 |

(Exhibit P–29). (See also Hobbie, 6: 374–5).

Moreover, the evidence demonstrates that even when women were permitted to hold the position of section chief, they were given responsibility over stereotypically "female work" and almost exclusively over female populations. (See, e. g., Yesko, 43: 5312; Smith, 43: 5296–7).

It is not surprising that women have been virtually excluded from supervisory positions. It is the incumbents of such positions who do the selection, and they are instructed to look for candidates who "did a good job" who could "handle people and handle new situations" and who "did not require a lot of instruction." (Vines, 14: 1396). The use of such vague criteria by supervisors who, as we shall discuss infra, almost invariably expressed a personal preference for men in completing their personnel requisition forms, again breathes life into plain-

tiff's statistics and demonstrates the discriminatory manner in which these criteria were applied.

Similarly, within the Operative, Service Worker and Graded Craft categories, as was shown above, women are clustered within the lowest grades. Despite the large number of women within the promotion pool, an examination of actual promotions during the 1973–6 period reveals that few women were promoted to grades 34 or above and that *no* women were promoted to grade 37 or above:

PROMOTION AND AVAILABILITY
OPERATIVES, SERVICE WORKERS
AND GRADED CRAFTS

| Date | #Males Promoted to Grade | #Females Promoted to Grade | %Promotions to Grade going to Females | % Females in Feeder Grade |
|---|---|---|---|---|
| 1/1-12/31/73 | | | | (12/4/72) |
| Promoted to Grade | | | | |
| 33 | 107 | 120 | 53 | 91.2 |
| 34 | 159 | 33 | 17 | 55.7 |
| 35 | 128 | 9 | 7 | 22.0 |
| 36 | 78 | 1 | 1 | 7.5 |
| 37 | 61 | 1 | 2 | 1.3 |
| 38 | 17 | 0 | 0 | 2.1 |
| 39 | 4 | 0 | 0 | 0.8 |
| 1/1-12/31/74 | | | | (1/6/74) |
| Promoted to Grade | | | | |
| 33 | 49 | 116 | 70.3 | 91.9 |
| 34 | 76 | 49 | 39.2 | 55.2 |
| 35 | 68 | 9 | 11.6 | 23.5 |
| 36 | 59 | 0 | 0 | 6.6 |
| 37 | 61 | 0 | 0 | 1.3 |
| 38 | 15 | 0 | 0 | 1.8 |
| 39 | 3 | 0 | 0 | 0.8 |
| 1/1/75 -12/31/75 | | | | (12/2/74) |
| Promoted to Grade | | | | |
| 33 | 16 | 13 | 44.8 | 90 |
| 34 | 65 | 4 | 5.7 | 57.8 |
| 35 | 61 | 0 | 0 | 26.4 |
| 36 | 26 | 1 | 3.7 | 8.0 |
| 37 | 6 | 0 | 0 | 1.4 |
| 38 | 3 | 0 | 0 | 1.6 |
| 39 | 1 | 0 | 0 | 0 |

| Date | #Males Promoted to Grade | #Females Promoted to Grade | %Promotions to Grade go-ing to Females | % Females in Feeder Grade |
|------|-------------------------|----------------------------|----------------------------------------|---------------------------|
| 1/1/76 – 12/31/76 | | | | (12/1/75) |
| Promoted to Grade | | | | |
| 33 | 63 | 80 | 55.9 | 68.9 |
| 34 | 91 | 57 | 38.5 | 53.3 |
| 35 | 45 | 1 | 2.1 | 24.4 |
| 36 | 38 | 3 | 7.3 | 7.7 |
| 37 | 32 | 1 | 3.0 | 0.5 |
| 38 | 7 | 0 | 0 | 1.2 |
| 39 | 1 | 0 | 0 | 0 |

(Exhibits D–191, 204, 238)

This disparity is not explained by seniority, by job qualifications or by occupation. Plaintiff's exhibits 217–222 show that for the years 1974, 1975 and 1976, females in each grade had substantially greater seniority than males in each grade. The job specifications for the higher-graded positions reveal that the only skills, knowledge or experience required are attainable through experience in Western's lower graded jobs. Moreover, even within the so-called "women's occupations", positions within the higher grades are filled primarily by men. (Exhibits D–204; P–77; P–83). Thus, women do not even progress within the occupations into which they have been segregated.

The same pattern exists within the Clerical category. As of January 30, 1975, in both the "200" and "500" series, women at each grade had between two and ten years greater seniority than men. (Exhibits P–27, P–28).

"200" Series

| Grade | Years Greater Seniority of Females |
|-------|------------------------------------|
| 204 | 1.85 |
| 205 | 5.06 |
| 206 | 5.90 |
| 207 | 7.07 |

"200" Series

| Grade | Years Greater Seniority of Females |
|-------|------------------------------------|
| 208 | 2.83 |
| 209 | 9.21 |
| 210 | 3.97 |
| 211 | 7.08 |
| 212 | 10.08 |

(P–27, P–28).

"500" Series

| Grade | Years Greater Seniority of Females |
|-------|------------------------------------|
| 503 | 2.69 |
| 504 | 6.36 |
| 505 | 5.99 |
| 506 | 4.32 |
| 507 | 9.60 |
| 508 | 6.03 |
| 509 | 10.03 |
| 510 | 8.19 |
| 511 | 6.50 |
| 512 | 8.01 |

(P–28(b))

The same is true within the remaining job categories at Western. For example, between 1972 and 1975, within the Techni-

cal category, 5 males were promoted to the position of Information Associate; no women were promoted to this position. During this same period, 14 males and only 1 female were promoted to the position of Engineering Associate. (Exhibit P–74). During these same years, within the Professional category there were 27 promotions within the ANSE (Administrative Non-Supervisor Employee) position. Only 14.8% of these promotions went to women. It was not until 1977 that a female was promoted to an ANSE–3 job (Exhibit D–204) and, to date, no woman has held an ANSE–4 job, whether by hire, promotion or transfer. (Exhibits D–204; P–74). Moreover, those women within the ANSE category have been clustered into ANSE–1 positions from which no promotion is possible, in jobs such as Pioneer Representative, Dietician. (Exhibits D–204; P–91(a)). Similarly, during this same period, 5 males and no females were promoted to Senior Information Systems Staff member; 22 males and 7 females were promoted to Information Systems Staff member. (Exhibit P–74).[8]

## VII. PARTICIPATION IN TRAINING PROGRAMS AT WESTERN

Training programs have a great impact at Western. Having heard the testimony of nearly two score of Western's former and present supervisors, and having studied their employment histories, the Court was struck by the fact that nearly all of them rose from what are generally considered "blue collar" jobs to important supervisory positions in fields unrelated to those into which they were first hired.

Western has operated two programs to train individuals for jobs in supervision: the Shop Staff Training Program and a program which hires staff trainees.

The Shop Staff Training Program trains individuals with shop backgrounds for positions as section chiefs. (Vines, 13: 1372; 15: 1492; Exhibit D–211). During the

years 1964, 1965, 1966, 1970, 1973 and 1975, only 4 females participated in this program as compared to 64 males. (Exhibit P–30). It was not until 1970 that a female participated in this program at all. Although the pool from which these trainees are drawn is the operative classifications, females within this pool were largely ignored even after 1970:

| Year | Percentage of Women Within Operative Classifications | Percentage of Women Trainees |
|------|------|------|
| 1970 | 42% | 5% |
| 1973 | 46% | 8% |
| 1974 | 47% | 16% |

(Exhibits P–30; P–76, Tab 6; P–77, Tab 5; D–204, Tab 1970).

The second program which trains individuals to become section chiefs draws from new employees hired into the classification denominated ANSE–I Staff Trainee. (Vines, 14: 1400; 15: 1492; Exhibits P–91(a); P–18). During the period from 1967 through 1976, no female was ever hired into this classification while 58 males were hired. (Vines, 14: 1400; Exhibit P–74). Western has failed to explain this disparity.

Western also operates a training program for technical-professional employees at its Corporate Education Center in Princeton. (Kubicki, 15: 1566). Female professionals who were selected to participate in this program were encouraged to take courses in such non-technical areas as "Creative Thinking", which could not lead to any substantial career advancement. (Exhibit D–211).

Western has also operated two programs designed to train individuals in skilled crafts: the Apprenticeship Training Program and the Plant Trades Training Program. In order to be eligible for entry into these programs, a candidate had to have a working knowledge of a particular craft. Western has produced evidence that

---

8. Also within the Professional category is the position of Engineer which will be discussed *infra* in connection with Kyriazi's individual case.

the pool from which it draws participants in these programs consists of vocational school graduates, who are almost exclusively males. (Schmaydey, 42: 5166; Vines, 14: 1497; Killman, 42: 5173). Accordingly, with respect to these two programs, the Court finds that the failure to select women was not the result of discrimination.

## VIII. LAYOFFS

The Kearny workforce has been declining over the past ten years. In 1968, there were 14,502 employees; in 1970, there were 13,000 employees; in 1976, there were 8,000 employees and by May, 1977, Western's workforce was reduced to 7,133 employees. (Exhibit D–204). Of the approximately 5,284 employees whom Western laid off between 1970 and 1976, 63% were women while only 37% were male. (Vines, 13: 1349–50, 1553; Exhibit P–17). An examination of the procedures governing layoffs sheds light on this disparity.

The collective bargaining agreement in effect prior to August, 1974 ("the 1971 Agreement") provided, in essence, that individuals would be laid off by occupation and grade, in inverse order of seniority. Thus, under this system, the line supervisor would declare a surplus, and the surplus would then be pegged to an occupation, grade level and department chief's organization. (Vines, 15: 1518; Grider, 54: 5542–3). The individual with the least seniority within that occupation, grade level and department chief's organization was the one laid off. However, management retained complete discretion *not* to lay an individual off. (Vines, 14: 1424–5).

If management chose to retain a surplus employee, they had the option to either transfer him laterally if there was a vacancy within his grade level, or, if that proved unsuccessful, to "bump" him down. (Grider, 45: 5513–5).

The "bumping" process worked essentially as follows. An employee may bump down only within his own occupation, but, even then, he may not bump an employee with greater seniority. Thus, for example, if a surplus were declared at the level of grade 34 benchman, the individual within that grade with the least seniority would either be laid off, or if management so chose, he would "bump" a grade 33 benchman with less seniority.

While seniority was a factor in the "bumping down" process, there was no such thing as "bumping up". (Vines, 15: 1515). Thus, if a surplus were declared at grade 32, a grade 32 worker with twenty years seniority could be laid off even if there were a grade 33 worker within that occupation with only two years seniority.

Effective August 1974, Western entered into a new collective bargaining agreement with Local 1470, covering operatives, service workers, "200" clericals and crafts.[9] Under that agreement, employees in the lowest grades (32, 202 and entry levels 33 or 203) were to be laid off *regardless* of where the surplus lay and *before* employees in the next highest grade could be laid off. Thus, that agreement, in effect, provided for the opposite of L–I–F–O [10] in that a class of

---

**9.** The collective bargaining agreement effective August 14, 1974 (hereinafter the "1974 Agreement") provided that when lack of work necessitated decreasing the workforce, it would be accomplished in the following manner (P–86(b)):

(a) employees in Grades 32, 202 and entry level Grades 33 or 203 would be laid off first in inverse order of seniority (without regard to where the surplus actually existed);

(b) the surplus would *then* be identified by occupation, grade and Department Chief's organization;

(c) the process of displacement would then occur by Manager's organization for employees with less than ten years service and plantwide for those with more than ten years service.

**10.** LIFO means the last-in-first-out. In collective bargaining the term commonly used having the same meaning is strict-seniority-plantwide, without regard to department or occupation. (Lenz, 47: 5739). In a LIFO or strict-seniority-plantwide situation, an employee is permitted to displace a less senior employee regardless of occupation. (Lenz, 47: 5740).

employees had to be cleared out, regardless of seniority, before employees in the next highest grade could be laid off. (Grider, 45: 5516). Only then would a surplus be declared, and the process of "bumping" would begin. *At the time that agreement was negotiated, 90% of all grade 32 workers were female; 80% in the grade 202–203 category were female.* (Exhibits P–77; D–204).

Plaintiff's statistics demonstrate that, under both collective bargaining agreements, women were laid off in disproportionate numbers, seniority notwithstanding, and that they were "bumped" by men. For example, Exhibit D–204 demonstrates that within five different grade 32 occupations, the numbers of women relative to the number of men changed drastically between 1970 and 1977. While in 1970 there were 90 female (and no male) grade 32 adjusters, by 1977, there were 51 females and 33 males within this grade and occupation. Similarly, in 1970 there were 648 female grade 32 benchhands; in 1977, there were only 275 females within this grade and occupation, while within this same period the number of men had increased from 66 to 214:

| OCCUPATION TITLE | 1/10/70 32 | | 1/15/71 32 | | 1/10/72 32 | | 12/4/72 32 | | 1/6/74 32 | | 12/2/74 32 | | 12/1/75 32 | | 1/3/77 32 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | M | F | M | F | M | F | M | F | M | F | M | F | M | F | M | F |
| Adjuster | | 90 | | 54 | 4 | 80 | 3 | 103 | 2 | 101 | 2 | 101 | 131 | 55 | 33 | 51 |
| Assembler | 72 | 654 | 36 | 466 | 50 | 441 | 60 | 468 | 61 | 496 | 56 | 446 | 145 | 264 | 146 | 251 |
| Benchhand | 66 | 648 | 30 | 404 | 42 | 515 | 37 | 578 | 40 | 648 | 50 | 567 | 210 | 344 | 214 | 275 |
| Coil Winder | | 47 | | 42 | | 41 | | 34 | | 44 | | 39 | 8 | 24 | 17 | 21 |
| Wireman | 2 | 638 | 2 | 317 | 1 | 366 | 1 | 397 | 1 | 368 | 3 | 382 | 32 | 244 | 12 | 196 |

(Comparison of Seniority of Men and Women)

| | 1974 | | | | 1976 | | | |
|---|---|---|---|---|---|---|---|---|
| | Total EES | %F | Av. F Ser. Date | Av. M Ser. Date | Total EES | %F | Av. F Ser. Date | Av. M Ser. Date |
| GRADE 32 * | | | | | | | | |
| Adjuster | 102 | 98 | 67–2 | 68–7 | 74 | 70 | 59–12 | 56–11 |
| Assembler | 492 | 88 | 62–5 | 68–7 | 393 | 63 | 55–8 | 57–7 |
| Coil Winder | 37 | 100 | 67–9 | – | 38 | 55 | 60–11 | 58–12 |
| Benchhand | 611 | 93 | 63–4 | 65–4 | 493 | 56 | 56–2 | 57–5 |
| Wireman | 365 | 99 | 68–6 | 64–4 | 222 | 92 | 61–6 | 61–6 |

(Exhibits P–218, P–220, P–222).

## IX. WAGES

By overwhelming statistical evidence, plaintiff has established that women at Western earn less than men. This result is not surprising; indeed any other would be, given Western's policies which slot women initially into lower grades, exclude them totally from certain kinds of work, overlook them for advanced training and promotion, and lay them off in times of business adversity. All that being so, however, the Court finds that at this time it is virtually impossible to fix a monetary value on either what all the women employees in the class have lost, or what any one of them—exclusive of the plaintiff herself—may have lost as a result of Western's discriminatory employment practices. The Court, at least at this stage, is simply not prepared to accept or adopt the regression analysis of plaintiff's expert, Dr. John Ullman. The Court found Dr. Ullman's testimony unhelpful in deter-

mining this issue, in large part because his criteria and their valuations were quite arbitrary and subjective, and, frankly, in larger part because his testimony was simply not comprehensible to the Court. There will have to be a second stage in this case, at which time we will determine the amount of damages the class, or any member of it, has sustained. It is sufficient for now to find that wages have been lost by women as a result of sex discrimination by Western and to reserve for later the determination of just how much.

## X. OTHER EVIDENCE OF DISCRIMINATION AT WESTERN

Were this merely a case based on statistics, we would already be satisfied that the plaintiff has discharged her burden; indeed, under *Teamsters, supra,* a statistical showing such as this would compel that result. However, we have before us the rare case in which the plaintiff, in addition to the circumstantial evidence of her statistical case, has produced direct evidence of discriminatory intent. Plaintiff here has done more than provide the Court with cold statistics; she has exposed the very attitudes which produced those statistics in the first place; attitudes held by individuals in key positions at Western, which regard certain jobs as suitable for men only, and others—inevitably the lowest paying—as suitable for women only.

We turn first to the "Requisition for Personnel" forms.

The history of the "Requisition for Personnel" forms—their alteration by employees of the defendant and their eventual discovery by the plaintiff—was the subject of an earlier opinion by this Court:

> Plaintiff's counsel, on March 31, 1976, while conducting discovery on the Western premises, came upon certain documents—Requisitions for Personnel—the existence of which had theretofore been unknown to plaintiff. These Requisitions were forms sent by a company supervisor to the Western Personnel Office when a supervisor had a position to fill within his department. Only three such Requisition forms were found, each stapled to Placement Lists which had but recently been made available to plaintiff through discovery. Because there were hundreds of Placement Lists, all showing staple markings, plaintiff's suspicions were aroused. She wanted to know the whereabouts of the remainder of the Requisition Forms. The answer to this question seemed critical because *the Requisition forms contained blanks where a supervisor, by making an X mark in the appropriate space, could indicate whether he preferred a male to fill the slot, or a female, or whether he had no sex preference.* At a conference scheduled before the United States Magistrate later that week, plaintiff's counsel, Ms. Vladeck, expressed concern about what she considered to be tampering with the evidence, that is, the detachment of the requisition forms from the placement lists. Mr. Lynch, counsel for Western, and Ms. Vladeck attempted to work the matter out *inter sese,* and on April 8th, Western Electric turned over to plaintiff some two thousand requisition forms. Upon examination of these forms, Ms. Vladeck's suspicions were further excited. It appeared that the forms had been altered to obscure the fact that supervisors using the forms had indicated sex preferences, and to obscure the particular sex preference which the supervisor had indicated. Unlike the three forms discovered on March 31st, many of the forms had X marks, in different colored inks, in all three sex preference blanks—M, F, and M or F.

> The following day, plaintiff brought an emergent application before the Court charging that the forms had been deliberately and recently altered by Western Electric. Although counsel for Western denied that the forms had been recently altered, the Court deemed it appropriate to give plaintiff an opportunity to have an expert examine the documents in order to substantiate the claim of recent alteration, and to protect the forms and

from possible further alteration. Accordingly, the Court ordered these documents removed from Western's possession, granted temporary custody of the forms to plaintiff, and authorized her to engage in discovery to support her charges that the Requisition Forms had been improperly withheld and altered.

Plaintiff proceeded with her investigation and presented an Order to Show Cause why Western Electric should not be punished for contempt. She maintained that she could prove that the Requisition Forms had been altered between the time they had been requested and the time they had been turned over. A return date was set for June 17th.

Two days before the return date, counsel for Western Electric requested an opportunity to appear before the Court. He conceded that the Requisition Forms had been recently altered. Furthermore, he conceded that Western Electric employees may have committed perjury in deposition testimony concerning the forms. *Kyriazi v. Western Electric*, 74 F.R.D. 468, 469–70, n.2 (1977).

At trial it developed that Western's employees not only "may have committed perjury in deposition testimony concerning the forms", as conceded by Western's counsel, but that they actually did. Not only did they give such false testimony under oath, but, as they finally admitted at trial, they altered the Requisition for Personnel forms to conceal the fact that Western's supervisors had been expressing a sex preference for men in the hire and promotion of employees.[11]

---

11. Thus, for example, Catherine Neal testified as follows:

BY MRS. VLADECK:

Q. Mrs. Neal, on April 25, 1976, you gave testimony in Mr. Lynch's office. I asked you questions and you answered them.

Do you recall that?

A. Yes.

Q. And have you recently reviewed the testimony you gave there? Have you recently read it?

A. Yes.

Q. Let me ask you some specific questions. On Page 61 of transcript I asked you, Mrs. Neal, what you did when you got the four copies back from the line organization?

\* \* \* \* \* \*

THE COURT: Was it accurate?

THE WITNESS: No, I'm very sorry. I just didn't want to admit my boss told me to cross out the X's and I'm sorry I lied.

THE COURT: Are you telling me that you lied under oath?

THE WITNESS: I didn't realize how serious it was.

THE COURT: Did you understand that you had been sworn?

THE WITNESS: I understood it, but I still didn't, you know, I didn't know it was really that serious.

THE COURT: Aside from whether you regarded the placing of the X's as serious, did you understand that you had been sworn to tell the truth at the time you were deposed?

THE WITNESS: I knew I had been sworn in.

THE COURT: And did you thereafter deliberately give false testimony?

THE WITNESS: Your Honor, I did.

\* \* \* \* \* \*

THE COURT: What was the occasion that Mr. Riordan told you that?

THE WITNESS: I really don't remember.

THE COURT: What was the conversation in the machine room with Mr. Hobbie and the other analyst?

THE WITNESS: This was concerning X marks on the requisitions, male, female, and mail [sic] or female.

THE COURT: What did Mr. Hobbie say?

THE WITNESS: He wanted to know whether we had recently put those Xes [sic] on the requisitions.

THE COURT: Where on the requisitions?

THE WITNESS: In male, female and male or female. There were X's on all of those columns.

THE COURT: Madam, did there ever come a time you in fact, under the instructions of Mr. Riordan, put X's in those boxes?

THE WITNESS: Yes.

THE COURT: Was that before or after the meeting with Mr. Hobbie?

THE WITNESS: I think the meeting—I think that was on a Monday and the meeting was on a Tuesday.

THE COURT: In other words, on Monday you altered those documents?

THE WITNESS: Well, I wouldn't call them altered. I was just doing what he says. But I wouldn't call them altered, the documents. I wasn't [sic] call them altered.

THE COURT: Did you change them?

THE WITNESS: Yes.

THE COURT: Did you change them because he told you to?

THE WITNESS: Because he told me to, not knowing how serious it was. Not realizing.

Note 11—Continued

THE COURT: Did he tell you why he wanted you to change them?

THE WITNESS: No, he didn't. I told him I was very busy that morning, but he wanted me to change them before lunch.

THE COURT: Did he tell that to anybody else?

THE WITNESS: Two other investigators.

THE COURT: What are their names?

THE WITNESS: Armand Zambartti [sic] and Hank Sawicke.

THE COURT: How many personnel requisition forms did you change roughly?

THE WITNESS: I don't know.

\*　　\*　　\*　　\*　　\*　　\*

(Tr. 17: 1844–5; 1835–7)

Armand Zambardi testified:

THE WITNESS: I don't like to use the term "altering."

THE COURT: Putting in X's or changing them or whatever you want to use?

THE WITNESS: Yes.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Did there come a time when you were summoned to take a deposition in connection with this case?

THE WITNESS: Yes, sir.

THE COURT: Were you summoned to a lawyer's office and there placed under oath?

THE WITNESS: Yes, sir.

THE COURT: Did you understand that you were sworn to tell the truth on that occasion?

THE WITNESS: Yes, sir.

THE COURT: Did you understand that if you didn't tell the truth, that if you lied, it would be the crime of perjury?

THE WITNESS: I didn't realize the full seriousness of what I did, sir.

THE COURT: When you were placed under oath were you asked questions concerning whether or not you had altered those documents?

THE WITNESS: Yes, sir.

THE COURT: Did you tell the truth?

THE WITNESS: No, sir.

THE COURT: Why?

THE WITNESS: Again, I just wanted to protect my supervisor. That's the only answer I can give you.

THE COURT: From what?

THE WITNESS: I guess that we marked them, the documents, sir.

THE COURT: What did you understand was wrong about marking them?

THE WITNESS: As I say, I realized after the situation that I marked evidence.

THE COURT: Did you know that when you were under oath in those depositions?

THE WITNESS: I guess—yes.

\*　　\*　　\*　　\*　　\*　　\*

(Tr. 17: 1980–3).

Henry Sawicke testified:

THE COURT: Did you understand when you were filling in forms you were doing something wrong?

THE WITNESS: No.

THE COURT: Did you understand when Riordan told you to fill in those forms he was doing something wrong?

THE WITNESS: I don't know if there was anything wrong because it was our job to do that originally.

THE COURT: But you felt you had to deceive Hobbie to protect Riordan?

THE WITNESS: That's correct.

THE COURT: Did you feel the truth would hurt Riordan?

THE WITNESS: I—the only thing bothered me was why didn't Riordan tell him that he told us to do it.

THE COURT: Why didn't he?

THE WITNESS: That's the only thing bothered me.

THE COURT: How do you know he didn't?

THE WITNESS: I don't know. He didn't tell us in the room. He didn't say anything.

THE COURT: He stood there silently?

THE WITNESS: He didn't say anything.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Thereafter, did you undergo depositions in this case?

THE WITNESS: Did I do what?

THE COURT: Were you given notice that you would be required to testify under oath in this case?

THE WITNESS: Yes, I was.

THE COURT: Did you go to a lawyer's office and so testify?

THE WITNESS: I did.

THE COURT: Were you asked questions concerning whether or not you had put X's on the boxes?

THE WITNESS: Yes.

THE COURT: Before you were asked those questions were you sworn to tell the truth?

THE WITNESS: Yes.

THE COURT: Did you tell the truth?

THE WITNESS: No, sir.

THE COURT: Did you lie under oath?

THE WITNESS: I lied on that one.

THE COURT: Did you understand when you lied under oath you were committing a crime?

THE WITNESS: Well, we felt because there was nothing ever wrong with these T's, it was our fault with not marking them. I thought there was nothing wrong with them.

THE COURT: Did you hear my question?

THE WITNESS: Yes.

THE COURT: Did you believe or did you understand that when you lied under oath you were committing a crime known as perjury?

THE WITNESS: At that time I didn't even think of it.

Requisition for Personnel forms which had boxes to indicate sex preferences were employed by Western. From the early 1960's until the day after Kyriazi discovered them in Western's files.

A Requisition for Personnel form was a form filled out initially by a Western supervisor, typically a section chief, when a job vacancy occurred in his organization. The form described the job opening, and, in a separate printed box, enabled the supervisor to check "M", "F", or "M or F", depending on whether he wanted the vacancy filled by a male or a female.

Note 11—Continued

THE COURT: Did you think it was all right to lie under oath?

THE WITNESS: It never came to my mind at that time.

(Tr. 17: 1948–50)

12. It must be noted that if the initial request originates above the section chief level, for example at the department chief level, the form, with its sex preferences, still requires three levels of approval. In that case it must be signed not merely by the assistant manager, but also by the manager of the department, and there is a box on the form with the printed title of manager and a place for the manager's signature.

13. In fact, Kenneth Kubicki, who for a time was in charge of Equal Opportunity at Western, admitted that *he* was aware these forms were in plantwide use:

THE COURT: Were you aware of the fact that your line supervisors were designating on the Request for Personnel forms their sex preferences?

THE WITNESS: There was—when it was called to my attention, a "W" or an "M."

THE COURT: That's a man or a woman, isn't it?

THE WITNESS: I looked at the 35–W as possibly a wage incentive opening. I didn't look at this as man or woman, I looked at those forms many times.

THE COURT: You were unaware that your line supervisors were routinely indicating or had the ability to indicate sex preferences on their Request for Personnel?

THE WITNESS: After the fact this was told to me, then I could see it very clearly. While it was going on, to me—the "W" to me I interpreted as possibly wage incentive opening. I never interpreted it as "man" or "woman."

THE COURT: What does the "M" stand for?

THE WITNESS: That could be some other coding. That was none of my concern.

THE COURT: Were you ever a line supervisor?

The Requisition forms were endorsed by three levels of supervisory personnel. Thus, after the section chief filled in the necessary information—*including the sex preference*—the form was forwarded to the department chief for endorsement and then to yet a third level of supervision, generally the assistant manager, for his endorsement.[12] It is apparent, therefore, and the Court so finds, that employees at every level of operating management knew that these forms were routinely used throughout the company.[13]

THE WITNESS: In the Toolmaker Training School.

THE COURT: Did you use those forms?

THE WITNESS: Yes.

THE COURT: Did you indicate a check next to an "M" or a "W"?

THE WITNESS: No. I told my secretary to make a form for an opening and place that place that [sic] with Personnel and approve it.

\* \* \* \* \* \*

THE COURT: When did you first become aware that the line supervisors were, in fact, indicating sex preferences?

THE WITNESS: When there was an investigation in June of '76—well, it was before this Court and there was a lot of furor and activity.

THE COURT: Was that the investigation concerning possible subsequent alteration of those documents?

THE WITNESS: You're right. Yes, your Honor.

THE COURT: You mean until there was an investigation into the destruction or alteration of those documents, you were unaware that there were documents in existence being routinely used by the company by which four or 500 line supervisors could express sex preferences?

THE WITNESS: It may sound naive, but that's true.

THE COURT: And it was you who were in charge of any independent investigation into whether or not line supervisors were acting discriminatorily?

THE WITNESS: We would investigate the charge, yes. And, of course, it was my concern.

\* \* \* \* \* \*

THE COURT: Were you aware that these forms, P–111, were in use?

And by the way, there is no M and W; there is an M and F, and it is under a block for sex.

THE WITNESS: Yes.

THE COURT: Were you aware that they were in use?

THE WITNESS: I had a passing acquaintance with them being in use, but my occasion to use them was very rare.

918

Not surprisingly, the Requisition for Personnel forms did little to enhance the position of women at Western. That males were preferred for the highest graded jobs at Western, and women for the lowest, is dramatically illustrated by the following table compiled from P–114 ("1974 Requisitions Containing Sex Preferences"):

| Position | No. of Males Requested | No. of Females Requested |
|---|---|---|
| Grade 32 openings | 9 | 87 |
| Grade 33 openings | 52 | 8 |

| Position | No. of Males Requested | No. of Females Requested |
|---|---|---|
| Grade 34 openings | 76 | 9 |
| Grade 35 openings | 60 | 1 |
| Grade 36 openings | 41 | 0 |
| Grade 37 openings | 23 | 1 |
| Craftsmen | 11 | 1 (for female waste and water treatment operator) |
| 500 Series Clerical | All | 0 |
| Clerical, grades 209 and above | All | 0 |
| Section and Department Chief | 9 | 0 |

Note 13—Continued

THE COURT: Did you, yourself, use these forms when you were a line supervisor?

THE WITNESS: I really don't recall. It has been so long.

THE COURT: As the man in charge of Equal Opportunity, were you aware that line supervisors were using these forms routinely whenever they had a vacancy to fill in their section?

THE WITNESS: Yes.

THE COURT: You knew that?

THE WITNESS: Yes.

THE COURT: Then you knew they were expressing sex preferences for hiring openings, that is so?

THE WITNESS: The form says so, yes.

THE COURT: I know the form says so. I'm asking you whether you knew that they were doing that?

THE WITNESS: I would have to admit to it, yes.

THE COURT: What do you mean, you would have to admit to it?

THE WITNESS: Well, I know EO, the investigation of going over many of these forms, sometimes the opportunity never occurred.

THE COURT: I don't understand what you just said, sir.

THE WITNESS: What I'm saying is that I had a limited exposure to these forms.

BY MRS. VLADECK:

Q. May I ask you a question, Mr. Kubicki? As Department Chief—

A. Yes.

Q. —if there was a requisition for any personnel in your department, don't you have to sign one of these before any job can be filled in our [sic] department? Not just as a line supervisor, but as a department chief, are you not obliged to sign off on one of these before any job could be filled in your unit?

A. This is only reasonable that I have had people that I could—that I could requisition people for positions. I was without portfolio [sic] for many years. The new form doesn't appear to be like this.

THE COURT: I'm not asking about any new form. I'm asking about the form that you just were shown, P–111. Apparently that form was used for many years. It was used by hundreds of line supervisors, approved by their department chiefs, and used to fill literally thousands of vacancies throughout the plant. Isn't that so?

THE WITNESS: Yes.

THE COURT: You say you would have to admit that you knew that that form was in use during the time that you were responsible for Equal Opportunities within the plant; that is so?

THE WITNESS: Yes.

THE COURT: You say that you understand it is in violation of the law for a supervisor to take into consideration the sex of an employee filling the job; is that so?

Didn't you tell me that a moment ago?

THE WITNESS: I don't know if I said it that way.

THE COURT: Well, as to—

THE WITNESS: Because of sex.

THE COURT: Yes.

THE WITNESS: Yes. To wipe somebody out because they were male or female, that is discriminatory.

THE COURT: Well, what about if you say you wanted a male or you wanted a female for the job? That, in effect, is telling the personnel department, isn't it, that they want a specific employee of a specific sex to be sent; isn't that right?

THE WITNESS: Yes.

THE COURT: Is that or is that not a violation of law as you understood it while you were in charge of Equal Opportunities?

THE WITNESS: Yes.

THE COURT: It therefore follows, doesn't it, that you knew that employers were indulging in these practices?

THE WITNESS: I guess I would have to admit to that, that I knew, but, again, limited exposure to the forms.

\* \* \* \* \* \*

(Tr. 1590–98.)

Western does not deny that the Requisition for Personnel forms were used throughout the company for many years. Rather, it claims that new forms were printed up in 1972 and that the old forms were still used in 1976 *solely* because supervisors were instructed to exhaust the old forms before using the new forms. Even so, it does admit that even *after* 1972, between 1974 and 1976, 27% of the forms did in fact designate a sex preference. (Vines, 12: 1224). Nevertheless, while admitting the continued use of the sex designation boxes after 1972, Western still claims that this "spirit of economy" was the only reason for the continued use of these forms from 1972 until April 6, 1976, *one day after the plaintiff found out about them as a result of Court-ordered discovery.* For obvious reasons the Court rejects this defense.

In a further attempt to downplay the significance of the sex designation forms, and their use even three years after this lawsuit was commenced, Western claims that the sex preferences were filled in by the *secretaries* of the section chiefs rather than by the section chiefs themselves. (Tr. 2094, 2098).

■ However, even the author of that theory, Mr. Norman J. Hobbie, who was the Assistant Manager for Western, and for a time the corporate official in charge of Equal Employment Opportunity at Western, conceded that this theory made little sense:

Q. Why did you want them there?

A. I wanted to hear from them because of my mind I recognized the use of old forms was certainly not something that was good so far as this particular case; that I knew it would be used against us in some way.

Q. Why?

A. Because it showed that the company showed preference for a particular sex.

Q. Or at least somebody in the company?

A. That somebody in the company—

Q. Showed that your line supervisors actually did care whether they were getting males or females?

A. That could be an assumption. My own feeling is that they ignored that area of the form.

\* \* \* \* \* \*

Q. Who filled out the form?

A. I must have filled one or two out in the time that I was at Kearny. And I can only evidently say I don't recall ever seeing a box that said, "Male", "Female," or anything. I just never looked at it.

\* \* \* \* \* \*

Q. So the forms to the extent they had been filled out by line supervisors did indicate that those line supervisors did have a preference, didn't it?

A. They or their secretaries, you know.

Q. They had to sign them.

A. I see, your point, that, yes, you sign a piece of paper.

Q. Then it had to go up to the Department Chief for his countersignature; isn't that right?

A. I think it goes through three levels. I'm not sure.

Q. They all have to sign it?

A. Yes.

Q. Is that why you were concerned that it might be used against the company?

A. I was concerned because I felt it was something that was damaging.

(Tr. 2093–2095).

While it is true that several other employees of Western testified that during the years 1972 through 1976 they, in personnel, had disregarded the expressed sex preferences of the Western supervisors in processing the forms and filling the openings, in

light of their admitted perjury and attempts to conceal and alter this evidence, the Court rejects such testimony as unworthy of belief and finds that the supervisors themselves knew of the continued use of the Requisition forms.

■ We catalogue other examples drawn from the abundant evidence of the discriminatory attitudes which prevailed at Western: ads for stenographers, typists, and keypunch operators describing women as "the other half of the team" (Exhibit P–53); the male only help-wanted newspaper ads used by Western until at least mid-1970 for all jobs except clericals (Anderson, 6: 425; Exhibits P–52, P–53); employment test results placed on different colored cards for men and women (blue for women, white for men); "word-of-mouth" hiring which, as plaintiff's statistics demonstrate, worked to the substantial disadvantage of women.[14]

This direct evidence of discriminatory intent and purpose sheds light upon and validates the inference which flows inevitably from plaintiff's statistics.

## XI. WESTERN'S DEFENSES TO PLAINTIFF'S PRIMA FACIE CASE

As noted earlier, a Title VII plaintiff may discharge her initial burden by creating, on statistics alone if need be, an inference that the employer has systematically discriminated against the class in its employment practices. Here, the impressive statistical showing made by the plaintiff, bolstered with evidence showing the discriminatory intent of Western's supervisors, clearly discharges her burden with respect to Western's practices in the areas of hiring, promotion, participation in job training programs, layoffs and, as a result of the foregoing practices, wages as well. The burden now shifts to Western to furnish an explanation for those statistical imbalances.

We turn now to Western's defenses.

### A. Western's Defense to Discriminatory Hiring of Women into Grade 32

■ Western does not dispute plaintiff's statistical showing (see V, supra) that women are hired disproportionately into grade 32, while men are hired into grade 33. Rather, it claims that it did women a favor by hiring them into this lower grade. (Def's Pr. Findings 570–575). It attempts to support this by arguing that since grade 32 Piece Workers—the category into which more women are hired than any other—earn more than grade 33 Day Workers—who are primarily men—women in grade 32 earn more than men hired at grade 33.

The basis of this contention is defendant's Exhibit 183–d admitted over the strenuous objection of the plaintiff and notwithstanding the Court's own expressed doubts as to the exhibit's reliability based on Western's destruction of the underlying data.[15]

D–183–d purports to demonstrate that grade 32 Piece Workers earn more than grade 33 Day Workers by setting forth the average weekly earnings for grades 32 and

---

14. See, for example, the statistics set forth in plaintiff's exhibit 19, showing that during the 1967–76 period, 86.1% of the "new hires" referred by a friend or relative were men:

NEW HIRES WHOM WESTERN ADMITS WERE REFERRED BY A FRIEND OR RELATIVE 1967–1976

| | NUMBER | PERCENT |
|---|---|---|
| Male | 105 | 86.1 |
| Female | 17 | 13.9 |
| TOTAL | 122 | 100.0 |

15. William Ammermann, a Senior Information Systems Staff member at Western and the author of D–183, admitted that the exhibit had been prepared solely for the purpose of this litigation. He further admitted that the salary data which were used to prepare the exhibit were no longer in existence. (Ammermann, 41: 5022–4).

(P–19)

33 Piece Workers on the one hand, and for grades 32 through 36 Day Workers on the other. Western had available the actual earning rate of these workers for the last fiscal week in 1971, 1974, 1975 and 1976. To these actual earning rates, it added a shift differential and, in the case of Piece Workers, the piece work percentage. The rate was multiplied by 40, representing the 40 hour work week. Thus, defendant claims that grade 32 Piece Workers earn $25 to $36 more per week than grade 33 Day Workers.

Having heard the testimony of the exhibit's author, Mr. Ammermann, the Court remains dissatisfied with that testimony and thus rejects D–183–d as unreliable. Moreover, to accept defendant's contention would be to find that the disproportionate grouping of women in grade 32 and men in grade 33 represents a favoring of the women over the men. In the context of the evidence of this case, such a suggestion is, to say the least, implausible. Nor did Western offer any evidence suggesting that women were offered the grade 33 positions, or that they turned such positions down in favor of the more "desirable" grade 32 jobs. In any event, it is clear to the Court, and the Court so finds, that in terms of promotion and layoffs, these women were severely disadvantaged by having been placed in the lower grades. Accordingly, the Court rejects this defense and finds that Western discriminated against women by hiring them into grade 32.

### B. Lack of Interest

Western seeking to rebut plaintiff's statistical evidence regarding promotions, claims that women were not promoted because they were simply not interested in promotion.

The record demonstrates, however, that when an employee was considered for promotion it was his supervisor who initially determined whether the individual was interested in promotion. (Hayeck, 42: 5206; Matthews, 43: 5252; Rotheramel, 43: 5273). If the supervisor represented that the individual was not interested, that individual was not interviewed and, indeed, never learned that he was a candidate for promotion. (Vines, 12: 1232). Further, the evidence demonstrates that women were never afforded the opportunity to express their alleged lack of interest, because they were rarely even considered for promotion:

Employee Placement Recommendation
Forms
1970–July 1976

| Period | No. of Males Recommended | % | No. of Females Recommended | % |
|---|---|---|---|---|
| 1970–1974 | 88 | 89 | 11 | 11 |
| 1975 | 95 | 74 | 31 | 20 |
| Jan.–July 1976 | 223 | 82 | 49 | 18 |

(Exhibit P–117).

The Court finds that Western itself became alarmed at these initial recommendations, and particularly at the "not interested in promotion" label utilized by Western to justify either the disqualification of a woman or the ultimate award of the promotion to a male. Thus, on February 22, 1974, P–115 was circulated to all managers:

February 22, 1974

MEMORANDUM TO ALL MANAGERS:

Re: Placement Procedure
This will supplement Mr. Hobbie's memorandum of February 6, 1974.

We have an additional Equal Opportunity requirement that compels us to document all cases where a female or minority group member is disqualified for upgrading or reclassification.

We recognize the burden that this will place on your organization but our Headquarters has reached this agreement with the federal agencies and we have no choice but to follow their direction.

Each case and each incident of disqualification must be documented individually over the signature of the line Department Chief. The memorandum should accom-

pany the placement list and the GN–92–3–CP—Rerate, Reclassification and Transfer Authorization form on the selected employee. The form cannot be processed by Personnel unless we receive the memorandum and placement list.

The documentation should contain the specific reason why the female or minority group member was disqualified.

If we receive multiple disqualifications, that appear justified, on an individual recommended for a particular grade and occupation, we will discuss the recommendation with the originating line organization. However, if the employee appears on a placement list due to being in a group selected as a feeder and the group is consistently disqualified, we will review the selection of feeder occupations with the line organization. By taking such measures, we would hope to avoid unnecessary correspondence on your part.

The Personnel Department has been notified of the above.

/s/ K. C. DREW—41000

Ten months later, that memorandum was updated by P–116:

December 26, 1974

TO ALL ASSISTANT MANAGERS:
Re: Placement Procedure

As you are aware, our affirmative action compliance agency (Department of Defense), the Equal Employment Opportunity Commission, and the State Division on Civil Rights have become very active in monitoring our progress in the movement of minorities and females into higher graded jobs.

In February and April of this year, we informed you of an Equal Opportunity requirement which necessitated the documentation over the line Assistant Manager's signature of all cases where females and minority group members are disqualified for upgrading or reclassification.

Effective immediately, we will also require documentation on cases where females and minorities turn down or refuse opportunities for upward movement. The documentation, over the line Assistant Manager's signature, should include the specific reason for the refusal.

We recognize that we have many instances of turndowns of upgradings by our employees for good reasons. However, when we fail to move minorities or females for any reason, we will need documentation which will be our most effective defense.

We would appreciate your advising your Department Chiefs and Section Chiefs of this requirement.

/s/ N. J. HOBBIE—41200

Copy to:
Managers
Manager, Merchandise and Service
Resident Head, Manager

Nevertheless, despite these directives, no documentation was supplied even though women continued to be turned down for "lack of interest". Mr. Elles Vines, who in May 1977 became head of EEO, testified that pursuant to P–115 and P–116, supervisors at Western "documented" each instance of "non-interest" or "disqualification" whenever either reason was used to pass over a woman for promotion. He testified that the system had a failsafe provision in that it was monitored by a half-dozen personnel analysts who would insist that such separate memos accompany each such passover. Upon direction of the Court, Vines agreed to produce these "substantial" number of memoranda, although Western claimed that they had already been discovered by counsel for plaintiff.

The next court day, however, Mr. Vines advised the Court that Western did not have *even one* such memorandum from any one of the 400 to 500 supervisors at its Kearny plant.

He then testified that *all* of these hundreds of supervisors, *each one of them*, had simply forgotten the directive each time a woman had been passed over because of her

lack of interest or because she was unqualified.[16]

Accordingly, in view of the fact that males were recommended for promotion in far greater numbers than females, thereby depriving females of the opportunity to express their "indifference", and the fact of Western's failure to document the instances of such disinterest according to its own directive, the Court finds no such lack of interest on the part of women at Western.

### C. The Collective Bargaining Contract

Western next contends that upgrading was controlled by the collective bargaining agreement and, therefore, that such decisions were effectively out of the hands of its supervisors. However, the procedure set forth in the collective bargaining agreement between Western and Local 1470, applicable to all jobs within the bargaining unit represented by the Union, simply provided that vacancies were to be filled by upgrade or transfer of "employees who have the qualifications for the job." (Exhibits P–86(a), P–86(b)). "Qualifications" were defined as "experience", "demonstrated productive efficiency", "skill or ability", "conduct on the job" along with term of employment. Only when these factors were "relatively equal" was term of employment to be given the greatest weight.

Western gave its first line supervisors the right to determine the qualifications of candidates for upgrade or transfer, with no written criteria for evaluating these qualifications. (McCarthy, 13: 2208; Niles, 19: 2190; Vines, 11: 1139). Thus, it is clear that Western's supervisors—who, as has been shown, were routinely making sex preferences in their Requisition for Personnel forms—were at all times perfectly free to interpret these qualifications in any manner they chose. While Western contends that it considered candidates only in order of seniority, in view of the statistical showing made by the plaintiff and the other evidence of discriminatory intent on the part of Western's supervisors, we must reject this contention.

### D. Defense to Statistics Regarding Layoffs

In an attempt to rebut plaintiff's statistical evidence with respect to layoffs, Western claims that in January 1975 it realized that the new layoff provision would result in the laying off of employees with longer seniority and the retention of less

---

16. THE COURT: Are you sitting here telling us now the motive and the reasons why the Supervisors throughout Western Electric, except for Clark, did not comply?

THE WITNESS: [VINES] Yes, your Honor. That's what I'm trying to explain.

THE COURT: Do you know why they didn't comply?

THE WITNESS: I can assume, based on these records, that they had forgotten it. We have talked to—

THE COURT: How many Supervisors are we talking about?

THE WITNESS: By the end of '75—

THE COURT: No, by the beginning of '75.

THE WITNESS: Oh. It would be somewhere in the neighborhood, I think, of 400.

THE COURT: And you mean that you are able to say now that all 400 forgot?

THE WITNESS: That's the only reasonable explanation, your Honor.

THE COURT: Well, is it possible that they simply chose to disregard it?

THE WITNESS: I don't know why they would choose to disregard that and not disregard the earlier letter of February.

THE COURT: What I am trying to understand is are you testifying now that you are reasonably certain that all 400 or 500 Supervisors, each one of these people, forgot this memorandum?

THE WITNESS: Your Honor—

THE COURT: There wasn't one Supervisor who remembered it?

THE WITNESS: I can't testify that not one remembered it. I can only speak for the facts. The facts are that none of them complied. I find it hard to believe that they would disregard the instruction in a case of one letter and obey it in the case of the first letter.

THE COURT: Do you find it difficult to believe that all four or 500 forgot it?

THE WITNESS: Almost, but not quite.

THE COURT: All right.

\* \* \* \* \* \*

(Tr. 15: 1489–90)

senior employees. (Grider, 45: 5516). Western claims that in January 1975, to prevent this from happening, it *orally* modified the 1974 Agreement with Local 1470 to follow the old practice of layoffs. (Grider, 45: 5534).

No witness could testify as to who actually bargained for Western with the Union, or where or when the alleged agreement was made. Grider testified that the modification was "probably" made by him and either the President or one of the officers of the Union. (Grider, 45: 5534). Nor was this "oral" modification ever communicated to employees or subject to ratification. (Grider, 45: 5536). Moreover, on August 13, 1977, Western and Local 1470 entered into a new agreement, effective August 7, 1977, which provides for the layoff of employees first from grades 32 or 202 and entry level grades 33 and 203 before the surplus is identified. This is the same provision, *in haec verba*, which Western claimed it orally modified in January 1975. (Exhibit P–201).

Accordingly, the Court rejects this defense and finds that Western never modified the 1974 collective bargaining contract and that it never abandoned its policy of initially laying off grades 32, 202 and entry levels 33 and 203.

## XII. KYRIAZI'S INDIVIDUAL CASE

We pass now to consideration of Kyriazi's individual case. That is not to say that the evidence relating to her individual case is to be considered separately from that relevant to the class as a whole. To the contrary. It is perfectly permissible for a minority member to establish a claimed act of discrimination against that individual by first demonstrating a general discriminatory intent against the class to which that individual belongs. Such evidence would be a piece in a mosaic which, along with other evidence, could establish the veracity of the individual's claims. The reverse, of course, is also true. Hostility to a class of persons as a whole—be it a racial, religious or gender-based class—can indeed be inferred by proven discriminatory acts directed against an individual member of that class. Thus, all of the evidence adduced in this case, class and individual alike, is to be considered as a whole in determining the question of liability to Kyriazi and/or to the class she represents. With this in mind, we turn to the specifics of her case.

Kyriazi was hired as an engineer by Western in April of 1965, just three months prior to the effective date of Title VII. She brought to Western an impressive catalogue of credentials. A native of Greece, Kyriazi received a B.S. Degree in Economics from the School of Economics and Business in Athens, Greece (1952). After she received this degree, she was employed for approximately five years by the Greek Ministry of Finance and the American Mission to Greece, where her duties corresponded roughly to that of an industrial engineer.

In 1958 she arrived in the United States, where she furthered her education. In 1961 she received the degree of Master of Business Administration from Columbia University, and in 1965 she achieved a Master of Industrial Engineering Degree, also from Columbia University. While at Columbia, she maintained a straight "B" average. (Exhibit D–26).

An examination of numerous personnel records of Western's employees conclusively demonstrates that plaintiff was, at least by virtue of background and training, far more qualified than many of Western's entry level engineers. Nevertheless, Kyriazi was hired at a salary of $725.00 a month (Exhibit P–153), which she claims was below the salary given male engineers at hire. However, since she was hired before the effective date of Title VII, no evidence was received or even offered concerning this contention. (Pltf's Pr. Finding No. 301).

From the very first, Kyriazi's experience with Western was fraught with difficulties. From first to last, her employment history

with Western was the subject of much conflicting evidence adduced before the Court.

It is Western's position that from the very first, Kyriazi was a most unsatisfactory employee. John Taddler testified that he was a Department Chief in the Finance Division of Western in New York and that he initially recommended that Kyriazi not be hired. He testified that he thought her grades too low. He also characterized her as a "slow learner".

Herbert Hornisher testified that from June to December 1965 Kyriazi was assigned to his training group. He, too, found her overall performance poor and did not recommend her for a salary increase in September or in December 1965. It was Hornisher's testimony that Kyriazi had personality problems as well and that he recommended that she be terminated.

On the other hand, Edward J. McDermott, a Development Engineer who worked daily with Kyriazi in October of 1965, while agreeing with the other Western witnesses that Kyriazi's work was poor, testified that he found her industrious, sincere, obedient and that he had no personality difficulties with her. Angelo M. Marca took over the department from Hornisher in December of 1965. By that time, he testified, the decision had already been made to terminate Kyriazi. He deferred telling her until after the holiday, and advised her of the decision in January. When she was so advised, Kyriazi became upset. Ultimately, it was determined that Kyriazi would be transferred to Kearny rather than terminated.

The plaintiff, of course, denies that she was an unsatisfactory employee while stationed at New York, and while the Court is not prepared to find that she was the veritable model employee that she claims to have been, either then or later, the Court is satisfied that the defendants' evidence concerning her poor performance in New York is not fully creditable.

First of all, the position for which she applied and accepted is one which required

neither a programming background nor a college degree, or so at least Taddler testified. Kyriazi had three degrees, two of them from one of the most prestigious universities in this country. Taddler's testimony that her grades at Columbia were too low for a job for which no degree is required at all is simply not borne out by the record. The achievement of a "B" average at Columbia by a recent immigrant cannot be so lightly brushed aside. Finally, the testimony of her lack of ability, dearth of aptitude, and inability to communicate in English, central to the testimony of her New York supervisors, is belied by subsequent Western supervisors who at various times rated her work "above expected" (Exhibits D–49, D–51) and "B +". While it is clear that plaintiff does speak with an accent, and that at times she is difficult to understand, this is principally because she is extremely soft spoken. Nonetheless, none of this stood in the way of her obtaining two graduate degrees at Columbia, more than satisfactory ratings from at least some Western supervisors and literally glowing endorsements from subsequent employers.

The personality of the plaintiff, her ability to "get along" with others—co-workers, supervisors and the like—has been challenged by Western. It is central to Western's defense that Kyriazi was a person who acted irrationally, was abusive to co-workers and to superiors, and was in general impossible to work with. Having heard witnesses with no relationship to Western as well as witnesses presently or formerly employed by the defendant, the Court concludes that while Kyriazi was and is a strong-willed person, who understandably and justifiably bridled at the discriminatory treatment she received by the defendant, she was not irrational nor was she unduly difficult to get along with, unless that term is construed to mean that she refused to supinely accede to the male-female stereotyping which confronted her at Western. The evidence in this case establishes clearly and convincingly, the sagacity of Chief Judge Breitel's language in *Pace College v.*

*N. Y. City Human Rights Commission*, 38 N.Y.2d 37, 377 N.Y.S.2d 471, 480 (1975):

It often happens that those who are not supine and fight for their rights will be regarded as troublesome and those disturbed by the struggle would wish that the troublesome one "would just go away."

For the reasons which follow, the Court finds that upon her transfer to the Kearny plant, Kyriazi encountered the top-to-bottom discriminatory sex policies of Western; that she refused to function within the sex segregated role expected of an employee at Western; that she actively protested and rebelled against what she perceived to be the unfair treatment of women at Western; and that in return she was denied promotion, discriminated against by her supervisors, unfairly denied salary increases, subjected to odious personal harassment by fellow workers and, finally, fired when, instead of complying with her employer's ulti-matum that she seek psychiatric help, she formally complained of sex discrimination.

When Kyriazi transferred to Kearny in 1966, as a professional employee of Western, she entered a world populated almost exclusively by men. The statistical evidence received in the class aspects of this case bears this out. During the period from 1967 through 1977, the number of female Engineering Associates ranged from zero to five; the number of males in such positions ranged from 332 to 118.[17] During the period from 1967 to 1971, no female *ever* held the position of senior engineer; no more than 2 females at any given time held the position of Occupational Engineer; and no more than one female held the position of Engineer.[18] During the period from 1972 through 1975, no woman engineers were promoted.[19] Indeed, as late as 1974 and 1975, the Requisition for Personnel forms still specifically requested that engineering positions be filled by males.[20]

17. 

| YEAR | # MALES | # FEMALES | % FEMALES |
|------|---------|-----------|-----------|
| 1967 | 332 | 1 | –* |
| 1968 | 344 | 2 | – |
| 1969 | 360 | 2 | – |
| 1970 | 360 | 3 | –– |
| 1971 | 343 | 3 | – |
| 1972 | 250 | 3 | 1.1 |
| 1973 | 294 | 5 | 1.6 |
| 1974 | 277 | 5 | 1.7 |

| YEAR | # MALES | # FEMALES | % FEMALES |
|------|---------|-----------|-----------|
| 1975 | 138 | 4 | 2.8 |
| 1976 | 121 | 1 | – |
| 1977 | 118 | 0 | 0 |

* Less than one per cent.

(Exhibit P–104).

18.

| YEAR | SENIOR ENGINEER | | OCC. ENGINEER | | ENGINEER | |
|------|-----|-----|-----|-----|-----|-----|
| | M | F | M | F | M | F |
| 1967 | 161 | 0 | 272 | 2 | 24 | 0 |
| 1968 | 153 | 0 | 254 | 2 | 27 | 0 |
| 1969 | 162 | 0 | 226 | 1 | 41 | 0 |
| 1970 | 161 | 0 | 223 | 1 | 50 | 0 |
| 1971 | 157 | 0 | 255 | 1 | 19 | 1 |

(Exhibit P–101)

19. From 1972 through 1975, there were the following promotions within the Engineering category:

| | Male | Female |
|------|------|--------|
| Engineer | 3 | 0 |
| Occupational Engineer | 46 | 0 |
| Senior Engineer | 30 | 0 |

(Exhibit P–102)

20. *See*, for example, Requisition for Personnel forms numbers 4–109 and 01–350 for the year 1974, for Development Engineers, in Exhibits D–220(b) and (c); Items numbers 80–10–11 and 12–13–14 for the year 1975, for 2 Occupational Engineers, 2 Senior Engineers and a Department Chief in the Engineering area, in Exhibit D–220(g).

Kyriazi entered Kearny as an Industrial Engineer, and remained in that position until February, 1969, when after her repeated requests, she was transferred to Information Systems. She alleges that during these first three years at Kearny she was discriminated against, as a woman, in that she was denied deserved promotions and salary increases because of her sex. In support of her claim she has marshalled an impressive statistical comparison between her career and those by males similarly situated. These comparisons support and lend credence to her claim. (*See* Pltf's Pr. Findings Nos. 302–315).

Western on the other hand, contends that Kyriazi performed poorly on the job, and that "these paper criteria" cannot establish the relative value of employees. While there is obvious value in the kind of analysis which Kyriazi has presented, it is also true that there are obvious limitations on its worth. For unlike statistics based on a large sample, where individual idiosyncrasies will even out, the comparison of *one* individual, on the basis of paper credentials alone, as against similar credentials of others, is of more limited value. While this evidence is certainly therefore not conclusive, it does appear to *corroborate* her claim of having been treated differently from her male colleagues. There is, however, more direct evidence which supports her claim that she was treated in a discriminatory manner.

Western's claim that Kyriazi's work and performance were not satisfactory is belied by the ratings which were given her by her supervisors at the time. In September of 1966 her work was rated "above expected" (Exhibit D–49) and again on February 27, 1967 she received the same evaluation (Exhibit D–51). This is obviously not the sort of job evaluation one expects an unsatisfactory employee to obtain.

Having sustained this rating of "above expected" for two years, Kyriazi was promoted and transferred. In about October of 1968 she came under the direct supervision of Ralph J. Imandt. She remained under Imandt's supervision until she was transferred to Information Systems in February of 1969.[21] It is clear that relations between Kyriazi and Imandt were not good. Kyriazi claims it is because Imandt did not want women working for him. She testified that he underutilized her as an engineer, told her that she would never be rated more than "C", and advised her that as a woman she should become a school teacher, "the best profession a woman can have." (Tr. 2442). It was her testimony that Imandt made life so uncomfortable for her, that by March of 1968, just three months after she had come under his supervision, she applied for a transfer.

Imandt denies that he mistreated her because of her sex. While Western now claims that it was "Imandt's opinion that Kyriazi did satisfactory work and had the potential to progress to higher ratings" (Def's Pr. Finding No. 889), it was his testimony at trial that her attitude and personality were unsatisfactory and that she had a "chip on her shoulder."

Having heard the testimony and having observed the demeanor of both witnesses, the Court credits Kyriazi's testimony and does not credit Imandt's. In addition to the Court's observation of the demeanor of these two witnesses, the surrounding circumstances appear to corroborate Kyriazi. Before addressing these matters, a word must be said about the rating system used at Western.

Professional employees at Western are periodically appraised, and, based on their job performance, are graded, A, B, or C, or "outstanding", "above expected", or "expected". (Exhibit P–91(b)(2)). During Kyriazi's tenure at Western, there was a policy of curving these evaluations, so that only 25% could be rated A, 50% at B, and

---

**21.** Imandt actually took over the department in October of 1967. However, he suffered a phlebitis attack on the day he assumed charge of Kyriazi's department and was out on disability until some time in January of 1968. (Tr. 3387). These dates become significant later.

25% at C. An employee's rating served as a basis both for promotions and raises. (Exhibits P–91(c)(3), (4), (5)).

When Kyriazi first came under Imandt's supervision, her rating was "N", meaning that she was a new employee who had not yet been rated. Although Kyriazi had been rated "above expected" before her transfer in 1967, Imandt considered this to be a grade of "C" (Kyriazi, 21: 2436) and he treated her as a new employee. (Imandt, 28: 3435). In early 1968, Kyriazi complained to Imandt about her rating, and also about the way in which women were treated in Western and the industry. She also told him that the failure to give her challenging assignments was a form of discrimination. (Kyriazi, 21: 3450).

It is clear that Kyriazi's complaint to Imandt about job discrimination against females alarmed not only Imandt, but Imandt's superiors as well. The fact is that although Kyriazi had worked for Imandt for only three months, and notwithstanding Western's assertion now that Imandt thought her work satisfactory and promising, Imandt, *on instructions from his superiors*, began to keep a running written account of his conversations with Kyriazi.

The first such entry is dated March 7, 1968, and refers to Kyriazi's earlier complaint of being unfairly rated and her prompt request to be transferred. (Exhibit D–74). Imandt's testimony, with its internal inconsistencies, as to the genesis of D–74 and his evaluation of Kyriazi is itself noteworthy:

THE COURT: They wanted a record, is that it?

THE WITNESS: Yes.

THE COURT: So I gather then that you don't have a similar memorandum for each one of the people that worked for you but rather you created this one because of the difficulties with Miss Kyriazi; is that it?

THE WITNESS: I had notes of other conferences with people.

THE COURT: But nothing like this document, D–74?

THE WITNESS: No.

THE COURT: That was created because of the difficulties with Miss Kyriazi, is that it, or so you believed?

THE WITNESS: So I believed.

\* \* \* \* \* \*

THE COURT: In other words, you had some idea back in '68, then, that there might be some difficulties?

THE WITNESS: Well, she had appeared so unhappy over the situation that she was working in and the fact that she told me she was going to go up the line, I thought it wise to make some notes.

THE COURT: She also complained to you about sex discrimination, didn't she?

THE WITNESS: Yes. In fact, she was very much—I would say almost like walking around with a chip on her shoulder waiting for somebody to knock it off to prove that she was being discriminated against.

THE COURT: How many times and how many conferences did she mention sex discrimination to you?

THE WITNESS: That I wouldn't know.

THE COURT: Was it a frequent occurrence? You say she walked around with a chip on her shoulder.

THE WITNESS: I would say quite—she never missed an opportunity to bring it up.

THE COURT: And when did she begin to complain about sex discrimination to you?

THE WITNESS: That I don't recall.

THE COURT: Was it from the very first time that she began to complain about anything, or was it later on?

THE WITNESS: I would say yes, it was—something was in the back of her mind at all times.

\* \* \* \* \* \*

THE COURT: What was the nature of her complaint about sex discrimination?

THE WITNESS: Well, that women in general were not treated on the same basis as men were.

THE COURT: In what way?

THE WITNESS: Well, they weren't given the opportunity to do the kinds of jobs that men were assigned to; a feeling that even in the grading or ranking order this had a bearing on it.

THE COURT: This was back in '68. She was making these complaints then?

THE WITNESS: Yes.

THE COURT: What responses did you make to her?

THE WITNESS: I assured her that it made no difference what the sex was. If a person had the capabilities of doing the job, they would be given an assignment.

THE COURT: At that time was there a sex preference designation box for personnel requisition form?

THE WITNESS: I believe there was, yes.

THE COURT: Did you use that form as a department chief?

THE WITNESS: I would have to say yes.

THE COURT: When you used it, did you fill out that box indicating a sex preference?

THE WITNESS: I would have to say yes. This was a custom not only at Western Electric but throughout industry.

\* \* \* \* \* \*

THE COURT: And what preference did you express when you expressed it?

THE WITNESS: I'm not too sure—I'm not too sure that we did check it off as a male operator or—a male engineer.

THE COURT: Perhaps I'm wrong. I thought that you just indicated to me that you did express a preference.

THE WITNESS: I did. I'm not too sure. I'm a little fuzzy.

THE COURT: You mean it may have been that you expressed a preference for women?

THE WITNESS: I'm sure I didn't express a preference for women on the job. It may have been either.

THE COURT: It may have been what?

THE WITNESS: We were interested in a qualified engineer regardless of sex.

THE COURT: Yes, I understand, Mr. Imandt. But I asked you whether or not you used the boxes on the sex preference?

THE WITNESS: On second thought, I don't think I did.

THE COURT: You don't think you did?

THE WITNESS: No.

THE COURT: Do you remember one way or the other?

THE WITNESS: Not definitely, no.

THE COURT: In other words, if I understand you correctly then, you viewed her complaints about discrimination based on sex as being without basis; is that it?

THE WITNESS: Right.

THE COURT: And she was complaining, I gather, about it more than just the one area that she was working in. She was speaking about a plant-wide condition to you, is that right?

THE WITNESS: That was her philosophy, yes.

THE COURT: Her philosophy?

THE WITNESS: That women were discriminated against and not given the opportunity.

THE COURT: You say that is a matter of philosophy?

THE WITNESS: Yes.

THE COURT: What do you mean by that?

THE WITNESS: I guess she was overimpressed with the fact that this was the case throughout industry, not just Western Electric.

THE COURT: What do you mean "overimpressed"?

THE WITNESS: Perhaps that was not the right word. It was deep in her mind and she never missed an opportunity to bring up a point on it.

THE COURT: When you say "her philosophy", then you mean the fact that she pointed out that in her view women were disadvantaged?

THE WITNESS: Yes.

THE COURT: At Western Electric?

THE WITNESS: Yes.

THE COURT: And, indeed, in American industry?

THE WITNESS: Yes.

THE COURT: Did you view that as a claim without basis?

THE WITNESS: No, because I would have to agree with her to a certain extent, that throughout industry this was the case.

THE COURT: Then when you say "a matter of philosophy, chip on the shoulder," and the like of that, are you meaning to imply that she was being irrational or unreasonable about it?

THE WITNESS: I would say she was to the point of being irrational about it.

THE COURT: You mean she was concerned about it to the point of irrationality?

THE WITNESS: Right.

　　*　　*　　*　　*　　*　　*

(Tr. 3418–3425)

Again, the objective evidence confirms the accuracy of Kyriazi's complaints to Imandt. It is interesting to note that the Kyriazi-Imandt confrontation concerning sex discrimination at Western began in early 1968 and carried forward throughout that year. The evidence in this case establishes that as late as 1974, six years after her protests to Imandt, and some three years after Kyriazi had been fired these sex preference personnel forms remained in full use at Western:

*Summary of 1974 Requisitions
Containing Sex Preferences*

There were 9 Section Chiefs or Department Chiefs requested. All requests were for males.

There were requests for 12 Craftsmen. 11 requests were for males; the 12th was for a female Waste & Water Treatment Operator.

There were 23 requests for Grade 37 openings. All requests were for males.

There were 41 requests for Grade 36 openings. All requests were for males.

There were 61 requests for Grade 35 openings. 60 requests were for males; 1 request was for a female.

There were 85 requests for Grade 34 openings. 76 requests were for males; 9 requests were for females.

There were 60 requests for Grade 33 openings. 52 requests were for males; 8 requests were for females.

There were 96 requests for Grade 32 openings. 9 requests were for males; 87 requests were for females.

All 500 series Clerical requests were for males.

All 200 series Clerical requests for grades 209 and above were for males.

Not all organizations shown on the requisitions were listed by Western in its answers to Interrogatories.

(Exhibit P–114).

It is, therefore, plain that Kyriazi's complaints to Imandt about the status of women at Western in general, and her condition in particular, were not the product of an irrational mind. We also consider some of this evidence *infra* in dealing with Western's contentions that Kyriazi is not a satisfactory representative of a class comprised of all female employees at Western.

As a result of her confrontations with Imandt beginning in early 1968, Kyriazi attempted to transfer out of his department

to work with computers in Information Systems. There is ample evidence in the record that those in authority in Information Systems told Kyriazi that they had no openings; they in fact did not want her; that she had been "turned down" both by Department Chief Wilser (Exhibit D–74b), and by Wilser's boss, Assistant Manager Wertz. "Imandt contacted G. C. Wertz to see if he would *reconsider* taking her into his organization. He asked to see her personnel records, which were given to him. After reviewing these records *and discussing the situation with J. Wilser* he concluded he could not find a place for her in his organization." (Exhibit D–74(b), emphasis added).

The evidence is clear that Wilser and Wertz did not take Kyriazi but not because there was no opening for her. (Tr. 2604–6, 3400; Exhibit D–74(b) page 3). In fact there were such openings. (Tr. 4534).[22]

It is impossible, looking back years later, to determine whether Wilser and Wertz did not want her because she was a woman or because Imandt had reported that she was a troublesome woman,[23] but it is plain that she was not wanted and that she was put off by them on the false ground that there was no available opening.

This situation with Imandt continued throughout 1968. Finally, in December, Kyriazi went to Imandt's boss, McCaffrey, Assistant Manager of Industrial Relations,

requesting to transfer to Wertz's organization in Information Systems. Imandt then prepared a letter for McCaffrey's signature, in order to arrange a transfer to Information Systems. That letter (Exhibit P–177) begins as follows:

> Miss K. Kyriazi, an Industrial Engineer with 34 months experience in our organization, has expressed a desire to be transferred to an. area where she can make more effective use of her educational background in the field of computers, economics and statistics.

There then follows her curriculum vitae, including her three degrees. Of her service with Western at Kearny, the letter reports

> . . . she was transferred to Kearny as an Engineer in the Industrial Engineering Organization where she is presently employed. During this period she has performed satisfactorily as an Engineer associated with Wage Incentives, Maintenance and Administration of Inspection and Merchandise Incentives.

Character of Work—Present Assignment:

> In her present assignment, *Miss Kyriazi has demonstrated ability to organize her work effectively and promote good relations with the organization for which she is responsible for setting Wage Incentive Rates.* She has developed a computer program for setting rates for the Box Shop in the Merchandise Organization.

---

**22.** The following people were in fact hired or transferred into Information Systems in 1968 or at the beginning of 1969:

P–145 S. T. Liu (hired)
P–149 E. Stewart (hired)
P–214 P. Crefeld (transferred)
P–147 R. McCauley (transferred)

**23.** As Imandt's memo notes:

This discussion, much the same as had previously taken place with R. J. Imandt ended by his asking her specifically what she wanted. He told her that before she could be placed anywhere that there had to be takes [sic] which to date we had been unable to find. Although she apparently wants to [sic] into the computer field she really wants Systems work and not programming.
She left with the understanding that she would think over the situation and try to be more specific in what she wants.

She was again impressed with the fact that there had to be an opening before any move could take place.
Throughout the foregoing discussions Miss Kyriazi expressed disdain for former Industrial Engineering supervisors to whom she had reported. She feels that they were not cognizant of her abilities and would not trust her on an assignment equal to those abilities in part because she is a woman working in what is generally a field for men. She is sure of her management capabilities and is very forceful in expressing this opinion.
One of her major drawbacks is her inability to make herself understood because of language difficulties. When this is discussed with her she disagrees and indicates that the reason people cannot understand her is that they are intellectually inferior.
(Exhibit D–74(b)).

It is recommended that you review this employee's qualifications for openings in your organization.

G. L. Mc Caffrey—3210

(Emphasis added.)

This memo was sent to Assistant Manager Wertz on January 8, 1969 and it was arranged for Kyriazi to be interviewed by Wertz.

At trial it was Kyriazi's testimony that at that interview Wertz insulted her and made it plain to her that he did not want "girls" because "they got married and pregnant." (Tr. 2250). She testified to similar treatment from one of Wertz's subordinates, Mr. Greco, with whom Wertz had arranged a follow-up interview. (Tr. 2251–3). At trial, both Wertz and Greco emphatically denied this.

Kyriazi's version does have corroboration. It is undisputed that *immediately* following her interviews with Wertz and Greco, she went to their superior, T. Arthour, and complained about the treatment she had received:

Q. [MRS. VLADECK] What did you do after you had left Mr. Greco's office?

A. I told him that I don't consider this a regular interview and I have to see someone higher in management.

So I left his office and I went directly and I saw the second Supervisor from the top, Mr. Arthour.

Q. Is that A—

A. A-r-t-h-o-u-r.

* * * * * *

THE COURT: Let me see if I understand you, Madam.

THE WITNESS: Yes.

THE COURT: You went immediately to this Mr. Arthour to consider about what Mr. Greco had said to you; is that it?

THE WITNESS: It was a combination of what Mr. Wertz and Mr. Greco—I mean, I went to complain because Mr. Wertz and Mr.—who was the Assistant Manager, and Mr. Greco, who was one of the Department Chief, they were telling me that they don't want girls.

THE COURT: I mean, that's the purpose—

THE WITNESS: The treatment; yes, sir.

THE COURT: —you went that very day?

THE WITNESS: Immediately. Because it was not so usual and I was trying for a year for this transfer.

* * * * * *

A. Well, I told him that "Mr. Arthour, for a year now I try to be transferred to the Information Systems and Mr. Imandt is telling me that he makes contacts, the necessary contacts, but he cannot find any opening for me, while I know that they hire and they transfer employees to this organization."

Then I described to him my conversation with Mr. Wertz and my discussion with Mr. Greco. And I told them that, "At least you should warn them not to be so explicit about speaking about girls and not wanting them; and things like this. So I would greatly appreciate if you would intervene and to let me transfer."

He immediately did the transfer and he told me that he's going to order all the applications of the women who had applied before, and they were not processed, to be processed, and have more women hired in the Information Systems.

Q. [MRS. VLADECK] Had you told him that there were applications of women that were not being processed?

A. Yes. Because Mr. Wertz told me.

Q. Now that was during your initial interview with Mr. Wertz?

A. Yes.

Q. I didn't hear you tell us that. What had Mr. Wertz told you about other women's applications?

* * * * * *

A. He told me there is no future for a woman in his organization and he gave me the example of two programmers, two women programmers who left his organization because they realized it.

After that he told me that "After all, we have a lot of applications from women but we don't even process them."

Q. And it was that that you reported to Mr. Arthour?

A. Yes.

Q. Was that part of your conversation with Wertz that you were referring to?

A. Yes.

Q. Now, you say Mr. Arthour ordered that you be transferred?

A. He was upset, obviously, and he told me not only are you going to be transferred, but I'm going to give an order that all these applications are going to be processed as quickly as possible.

Q. How long after the conversation with Mr. Arthour were you transferred?

A. Immediately. Immediately.

\* \* \* \* \* \*

(Tr. 2254–2259)

Kyriazi's account of her interviews with Wertz and Greco is corroborated by notations made by her Assistant Manager McCaffrey on a document found in the files of Western. Thus, plaintiff's Exhibit P–177a contains handwritten notations initialed "G.L.M." which are McCaffrey's initials. The notations set forth the schedule of Kyriazi's interviews in Information Systems as follows:

Interviewed by

| Wertz | 1/20 & 1/23 |
| Bagden | 1/20 |
| Hayes | 1/21 |
| Greco | 1/22 |

The handwritten statements continues:

As a result of these interviews she spoke to T. Arthur on 1/22. Not satisfied with interview by Greco. Arthur promised her he would do something. Also Wertz's second interview was to apologize for the treatment she was getting in her interviews by computer supervisors.

This document substantially corroborates Kyriazi's claim that she made an immediate and timely complaint about the conduct of Wertz and Greco, and the immediacy of that complaint fully corroborates her claim, at trial, that she had been abused by both men. Having heard all three witnesses—Kyriazi, Wertz and Bagden—and having reviewed the documentary evidence, the Court fully credits her account.

Such was the background of the inauspicious beginning of Kyriazi's employment in Wertz's organization. Wertz assigned her to work for Department Chief Wilser who, we have seen, had initially rejected her nearly one year earlier.

From her earliest contacts with Wilser, on through her interviews with Wertz, Bagden and Greco nearly a year later, Kyriazi made it plain to supervisors in Information Systems that she desired and was equipped to do work as a systems designer rather than the less sophisticated work of a programmer. (Exhibit D–74b). At trial there was substantial dispute concerning the terminology of these two endeavors—designer or systems engineer versus programmer—but suffice it to say that the Court is satisfied that there is a difference in the level of functions between the two and that Kyriazi, to the annoyance of her superiors, felt that she was qualified by reason of her education for the more sophisticated computer work.

It is apparent that Kyriazi was sensitive that at Western there was a difference in the level and the nature of the work assigned to men and women employees, and that she was *determined* that such artificial sex based classification should not be applied to her. It is also apparent that her perceptions were not the manifestations of a disordered personality, as Western would have it, but the product of perceptions which were, in terms of the working condi-

tions of females at Western, essentially accurate.

Immediately upon her assignment to Wilser, who was located on the 5th floor, Wilser sent her to the 3rd floor to work under the supervision of a fellow department chief, Ralph Boyd. Her assignment, on its face, was to act as a liaison between Wilser's and Boyd's departments in connection with a project then being run by three men within Boyd's department: James S. Snyder, team leader; and Robert Armstrong and Shen Tai "Teddy" Liu. Her experience with these three men form the core of her claim for tortious interference with her work.

It was Kyriazi's testimony that these three young men teased and tormented her. That they made loud remarks concerning her marital status, and trumpeted their speculations and even made wagers concerning her virginity. According to Kyriazi, they would tease her by deliberately blocking her path as she tried to move in the aisle. This harassment, she testified, spilled over into her working relationships with them, where they treated her with contempt and ridicule and attempted to denigrate her position as a professional. The three men concerned each testified and denied any such actions on their part. To the contrary, it was their testimony that it was she who harassed them and that, as a professional, her work was substandard and inept.

Again, we have a piece of objective evidence which sheds light on the controversy. Before we deal with it, however, it is necessary to give a physical description of the plaintiff. She is a very large woman, and, as she testified, weighs nearly 200 pounds. It was her testimony that, as a part of the attempt by these three co-workers to humiliate her, they created an obscene cartoon and that she saw Armstrong place it on her desk. She retained a copy of this cartoon, and it was received in evidence as Exhibit P–138:

A terrible accident happened at the Eyeful Nudist Colony. A very heavy lady weighing 312 lbs., by accident sat on a little man of 100 lbs. (What a disaster!) If you think the position of the little man was obvious, look below! I hope you will never be in such a predicament!

It was Kyriazi's testimony that she well understood that this cartoon was designed to embarrass and to humiliate her, *as a woman*. Western, while certainly not denying the existence of the cartoon, challenges her perception of the direction of the cartoon's thrust, claiming that "it is the man at whom the cartoon is aimed." (Def's Pr. Finding No. 940(a)). However, a mere glance at the cartoon and its inscription, along with what we know to have been the relationship between the parties, demonstrates the implausibility of Western's assertion. It is obvious to the Court that this cartoon was created, disseminated and ultimately thrust upon this plaintiff to humiliate her *as a woman*.

Kyriazi testified that she saw Armstrong place it on her desk. Armstrong denies it.

He claims to have found it in his desk and passed it on to Snyder. He claims not to have understood it at the time. His testimony is corroborated by Liu, who claims to have found it on his own desk, and then to have placed in on Armstrong's, and even to have seen Armstrong place it on Snyder's. Snyder claims that he found it on his desk and threw it in the trash where, presumably, Kyriazi is supposed to have fished it out. All three men deny any knowledge of the source of the cartoon.

The Court does not credit the testimony of these three men. There can be no doubt that this indecent drawing was created—exactly by whom we cannot now ascertain—and passed around by all three men to humiliate the plaintiff. It may indeed be true, as they claim, that the plaintiff was not at all that she should have been as a programmer—certainly the Court is not prepared to find that she was as perfect as she claims—but the Court finds in Exhibit P–138 an indecent attempt to humiliate plaintiff as a woman as part of an overall effort by them to make life generally unpleasant for her.

The Court further finds that Western supervisors at Kearny—Wertz, Boyd and Wilser—were well aware of this harassment to which Kyriazi was subjected, but that they chose to largely disregard her complaints and totally failed to take any action against the men who harassed her. This, the Court finds, exacerbated the situation. Aside from the implicit encouragement of such harassment which the superiors' knowing disregard engendered in Kyriazi's male co-workers, such conduct by her superiors was infuriating to Kyriazi, and justifiably so. When they totally disregarded Kyriazi's complaints about the cartoon, and the boisterous speculations about her virginity, she was left with the understanding that her superiors were discriminating against her and in favor of her male co-workers.

While the three superiors do not deny that the cartoon was disseminated in or around April of 1970, nor that they made no inquiry into these matters until August of 1971, three months before Kyriazi was fired, they each deny that Kyriazi complained to them in the spring of 1970.

The Court finds that Kyriazi did complain to her superiors in the spring of 1970. It is plain that she did not take this treatment supinely, but vociferously and repeatedly complained. Not only did she complain to Boyd, for example, she even complained to his secretary, Ms. Allen, and Ms. Allen testified that she herself told Boyd about the obscene picture and just how upset Kyriazi was. (Tr. 4713–14). Indeed, on October 1, 1971, in a joint interview of Kyriazi by Wertz and Wilser, which was recorded by Wertz, in which Kyriazi was given a last chance before termination, Wertz said in response to Kyriazi's complaints about Armstrong, Snyder and Liu:

> . . . you complained and *we* as soon as *we* knew about it *we* took action and *we* moved you. Now, this was more than a year and a half ago.

(Exhibit D–225(a); Wertz, p. 23) (Emphasis added).

It is plain that Wertz, during this conversation, acknowledged the receipt of Kyriazi's complaint, and explained what he did to solve her problem; moving her from Boyd's group on the third floor back to Wilser's on the fifth floor. His attitude towards her complaints was simply that a woman must expect such things in a man's world. Perhaps his attitude is best expressed in his own words, also tape recorded during the interview on October 1, 1971:

> Cleo: [KYRIAZI] No, it's not correct, sir.
>
> GCW: [WERTZ] It's, it's maybe it's cruel humor . . .
>
> Cleo: And when when . . .
>
> GCW: . . . but I would accept it as being . . .
>
> Cleo: . . . and when, last month, let's say, which aggravated me again, I met the fellows on the aisle. They said: "Come now, have it easy, Jim Snyder is not the old one. He's changed. Now, nobody bothers you. Let's leave". Let's leave? But Teddy Liu is B + and I am C ± and I have

seven years and I have worked. Everybody's laughing with me, you know. I don't have . . . Do you think that I have any prestige like before around here? Do you think that anybody's going to respect me like before?

GCW: Cleo, only . . .

Cleo: For me the only thing is to . .

GCW: . . . what you are doing to yourself. ·

Cleo: . . . to go out. This is the only solution.

GCW: I don't think it's the only solution.

Cleo: Yes, sir. Because nobody would respect me. Who young man now can respect me if he knows that he can call me *if I'm a virgin or not*? You know, give me *dirty pictures* and go through with this. And this *dirty picture* it *was a continuation of their discussion about the subject which we are discussing* now that I told.

GCW: *I tracked that down as well as I might and* . . .

 * * * * * *

(Exhibit D–225(a), page 27) (Emphasis added).

GCW: We moved you to the fifth floor.

Cleo: O.K. Sir. Forget about me.

GCW: We corrected that situation. Can't you put it to bed?

(Exhibit D–225(a), page 47).

GCW: Cleo, only because you are the one, *you brought this up in my office here at least a dozen times in the last year and a half.*

Cleo: Sir, if I didn't bring this, you would still have me, you know, have the opinion which you had at the beginning. You remember what you told me?

GCW: What?

Cleo: *You told me that I should be complimented that these young that young men pay any attention to me and these boys they were making a horse play, you know.* And, therefore, Mr. Wilser told me, I told him "Am I a silly woman?" And he said, "In a way." So if I didn't insist, you would still have the old opinion for me.

GCW: *The things that you mentioned, Cleo are things that happened in a man's working world every day in the week.*

Cleo: No, no, no, no sir!

GCW: *Yes.*

(Exhibit D–225(a), page 48) (Emphasis added).

What emerges from all of this is that in April and May of 1970 Kyriazi did complain to her superiors about the sexist conduct of her co-workers as she claims she did; that they made no effort to investigate her complaint; that she was regarded as an oversensitive woman who should be expected to meet and endure all this in "a man's working world." Wertz's later statement to her that he had tried to "track down" the comments about her virginity and the origins of the obscene picture, that he had moved her to the fifth floor to help her were both outright falsehoods.

The fact is that no attempt was made to investigate her complaints in April, May or June of 1970, before she was moved. Indeed, her superiors now take the position that they then knew of no such complaints. The only investigation that occurred was in, as we shall see, August of 1971, shortly before her termination, which was motivated by their desire to clean up the record. As to her move from the third floor to the fifth floor in June of 1970, this was done at Boyd's request because of *his* complaints about *her* failure to get along with her co-workers. (Exhibit D–77).

The Court finds that in June of 1970, Boyd, Wilser and Wertz, with full knowledge of her complaints, removed her based on their own conclusion that she was unable to get along with Snyder, Armstrong and Liu. Boyd, continuing the tradition begun by Imandt, prepared a confidential "Memorandum for Record". This Memo, Exhibit D–77, ultimately incorporated in Kyriazi's personnel record, was used in part to justify her ultimate termination (Exhibit D–109), and is a deliberately false and one-sided account of the relationship between Kyriazi

and her male co-workers.[24] That Kyriazi's supervisors should, in 1971, represent that she had been moved in 1970 to save her from the harassment of co-workers, while knowingly placing in her records a memo attributing the move to her unjustifiable rages and failures to accept guidance is, at least to this Court, grotesque.

Wertz's attempt to "track down" the insults to Kyriazi were, the Court finds, non-existent. Neither Armstrong, Snyder nor Liu were ever questioned by any supervisor about any of these incidents until shortly before Kyriazi was fired. Even then, they were questioned only because Kyriazi kept complaining to her supervisors. She felt that she had been unfairly treated by them. She felt that this unfairness spilled over to the way in which they appraised her work, graded her performance, failed to promote and even underpaid her. Her supervisors, for their part, continued to make their private memos for the "record" as they documented a case against her.

Thus, when Kyriazi made one of her frequent complaints to Wertz concerning her treatment, including promotional and sala-

ry, Wertz made a private memorandum for the record:

(PRIVATE)

August 5, 1971

MEMORANDUM FOR RECORD

Re: Kyriazi, Kyriaki

Miss Kyriazi stopped at my office at 9:30 a. m. with the question of what I had heard relative to her conversation with Mr. Clark. I told her that I had heard nothing.

She said that she could not stop with the people who had wronged her. I asked who she referred to, and she replied that it was those silly boys on the third floor. She then said if it could not be settled here it would be settled outside. I asked what she meant, and she said *she referred to the courts.* I then suggested it was difficult to come up with an answer to a question which is not clear, since I had assumed that her grievance was one of disagreement with management's performance appraisal of her. She replied that it was both this and the harassment which occurred on the third floor. I told

---

**24.**

June 15, 1970

MEMORANDUM FOR RECORD

Circumstances leading to Miss Kyriazi's change in physical location from the third floor (17–3) to the fifth (20–5):

Miss Kyriazi was temporarily loaned to this organization to develop a statistical sampling technique as a part of the Kearny Works Inventory Control Systems (KWIC). This required close liaison with development personnel in 3451.

As the project developed, Miss Kyriazi became incensed with the employees she came in contact with and on two occasions flew into a rage and left the area. Both of these outbursts occurred when supervision was temporarily out of the area.

The underlying cause of the friction is Miss Kyriazi's failure to accept guidance and direction, or even suggestions, from others. She felt she was being tricked or deliberately mislead [sic] by her project leader and associates. For example:

1. Miss Kyriazi had a card misplaced in her program deck and the computer test of the program completed. From that point forward she felt that the misplaced card was needed to complete a test.

2. Computer programs require Job Control Language Cards in order to submit the program to the computer for testing. The department Technical Coordinator tried to assist Miss Kyriazi in making up these cards and, when later the test did not complete, she felt that he tried to make her look bad and had deliberately sabotaged her job. She would not permit anyone to review her logic. In reality, it is quite normal to have minor errors embedded in both JCL Card and program logic during the initial stages of testing.

Continued reoccurrences of incidents of this type caused a completely intolerable situation surrounding Miss Kyriazi's presence in this organization.

Subsequent discussions were held between Mr. F. A. Wilser and the undersigned and it was felt that the project no longer required close liaison with 3451 employees and, for the good of all concerned, Miss Kyriazi should move to her department on the fifth floor.

Original signed by
R. S. BOYD, JR.—3451

RSB:MBS

(Exhibit D–77).

her I considered this matter closed because corrective action had been taken in June, 1970, to move her to the fifth floor *after she had complained to me.* She nodded agreement, but added that one is now an engineer, one is an "A" and one is a "B+". I indicated that if her information was correct, which I doubted, it had no bearing on either of her questions, and I would not discuss other individual appraisals with her.

Miss Kyriazi then asked if it was true that a Member needed to be appraised outstanding for 2½ years before qualifying for Senior. I reminded her that she had asked me that question twice before, and that in order to qualify for promotion to Senior, a Member required a minimum of two years appraisal as outstanding. Miss Kyriazi asked me what I was doing about it. I told her I was doing nothing about it. We moved her from the third to the fifth floor in June, 1970, to eliminate a personnel relations irritation *which she complained about at that time,* and we reviewed her rank order and appraisal earlier in 1971 when she expressed dissatisfaction with it. Our conclusions were that the "B" appraisal is correct. She guessed that management had to protect itself. *I told her that management had nothing to protect in this case.*

I suggested that nothing further could be gained by continuing the discussion. She agreed and left.

Original Signed By<br>G. C. WERTZ

**25.**

August 10, 1971

Mr. G. C. WERTZ—3450
Re: Cleo Kyriazi
Two episodes continue to crop up in discussions with Miss Kyriazi:

1. Obscene Picture: It is the understanding of the undersigned that these events lead [sic] to Miss Kyriazi's possession of the picture. The picture was placed by parties unknown on the desk of an employee next to Miss Kyriazi. Miss Kyriazi saw the picture and became very upset. (She apparently felt that it was directed at her.) The picture was thrown into the waste basket by another employee. Later, Miss Kyriazi demanded to know the whereabouts of the picture, searched waste baskets, and retrieved it for

G. C. WERTZ—3450
GCW:MBS
(Exhibit D–92) (Emphasis added).

This memo is important for several points. First, it again demonstrates that Kyriazi did complain of harassment in the spring of 1970. Second, it demonstrates that her supervisors knew that she intended to sue. In spite of Wertz's notation at the end that management "had nothing to protect in this case", he ordered Boyd to conduct an inquiry into her claim that she had been harassed by Snyder, Liu and Armstrong. This order was not motivated by any concept of justice, but instead by a desire to clean up and protect the record in light of Kyriazi's professed intention to sue.

Boyd dutifully caused an inquiry to be made, and made a *written* report to Wertz, obviously for the "record". *For the first time,* Armstrong, Snyder and Liu were interviewed, *but Kyriazi was not.* Based upon this "investigation", Boyd accepted their account. No effort was made to find the source of the cartoon. No mention was made of the jokes concerning Kyriazi's virginity. The record having been made, and the company protected, the memo closes with Boyd denying that the cartoon incident was brought to his attention.[25]

It has been necessary to delve into a detailed factual analysis in order to pierce a cloud of self-serving memoranda, prepared by supervisors who anticipated litigation, and who were preparing for it even while

her file. At no time was the picture given or even directed towards her.

2. Test coordinator: It was the policy of this organization to pick up tests from the I/O center each day. This job was assigned to each employee in turn for one week. The only exception was the project leader. Miss Kyriazi was assigned a three-day week and still felt that this was beneath her station because the project leader was not participating in the job. She felt she was being tricked into doing menial work for others.

*At the time, these two incidents were not brought to the attention of the undersigned.*

R. S. BOYD, JR.—3451

RSB:MBS
(Exhibit D–92) (Emphasis added).

they led Kyriazi to believe that they would meet her problems and continue her employment. What emerges is a picture of a woman who in fact was angry, who did in fact accost her superiors, and who did eventually become difficult to deal with. The fact is, however, that these manifestations, unpleasant and even intolerable in the normal working relationship, were understandable and even justifiable given their provocation.

Kyriazi felt, and the record supports her, that she was treated neither fairly nor regarded seriously by her male co-workers and superiors. This she found infuriating. There is no doubt she responded in kind, and that this caused a further deterioration in her position. When her male co-workers jested over her virginity, or the lack of it, she responded by terming one of them a homosexual. She had no right to do that; she was, as she should be, reproached for such conduct. But Wertz and Wilser, who were so outraged at her having called a *male* employee a homosexual, cared nothing for sexual taunts directed at a *female* employee. These they said should be expected in "a working man's world."

When Kyriazi was brought face-to-face with Wilser and Wertz in the tape-recorded conversation of October 1, 1971, and was confronted with the claim that she made derogatory remarks about her male co-workers, she replied that she was merely responding in kind. Wertz then suggested that she was suffering from a "mental disability". Shortly before the meeting, Wertz had made an appointment with the company doctor—a general practitioner—because he felt Kyriazi needed psychiatric attention. She put aside this suggestion, indicating that she thought her supervisors needed that attention more than she. Wertz was careful to note this conversation in yet another "memorandum of information", labeled "private". (Exhibit D–96).

By October 1, 1971, Wertz's resolve that Kyriazi undergo psychiatric examination had hardened to the point that he made it a condition for her remaining at Western:

GCW: The fourth point I want to make, Cleo . . .

Cleo: Yes, sir.

GCW: . . . is your maligning of other people.

Cleo: Maligning? What is maligning?

GCW: Maligning. That means, in your terms, being disrespectful of their characters, of their talents, of their morality. You have even gone so far as to refer to someone else as being a homosexual.

Cleo: Well this is . . .

GCW: This is maligning an individual . .

Cleo: I don't mal-

GCW: . . . particularly if it is not true . . .

Cleo: I'm not . . .

GCW: . . . which it very probably isn't.

Cleo: . . . maligning anybody, sir, because it was something which downstairs Bob Armstrong and Teddy Liu used to joke around and poke their ribs and laugh. I'm not, I don't know about these things and I'm out of everything and this is the reason I was telling you. I (inaudible).

GCW: *What they have done hasn't bothered me, Cleo.*

Cleo: *Well, it bothers me.*

GCW: But they have not referred to someone else as being a homosexual . . .

Cleo: Well

GCW: . . . you have.

Cleo: Well, excuse me, *am I a virgin or not*? If they have the right to discuss of this, why I should not have a right to counter-attack and cover myself. Do you understand?

GCW: No, I don't understand, Cleo.

Cleo: Well, I understand myself. And nobody use to to cover me. This is the reason I wanted to move from down because I am not born to live around in such a an environment. This is the reason sir . . .

GCW: Cleo, *but this happened* . . .

Cleo: . . . it came to my nerves.

GCW: . . . *a year and a half ago* . .

Cleo: No no it runs after me.

GCW: You have been moved to the fifth floor.

Cleo: It runs after me sir. It runs after me.

GCW: Well, Cleo it has not come to my attention but it has come to my attention . . .

Cleo: Sir I told you one thousand times my, whatever I say come to your attention and whatever these young men did to me for a long period of time didn't come to your attention. What else you want me to do? If I didn't speak, loudly, sir, by now, they would have me down playing like a ball with me.

GCW: Cleo . . .

Cleo: But it is not my morality.

GCW: . . . *you complained and we as soon as we knew about it we took action and we moved you. Now, this was more than a year and a half ago.*

Cleo: This was after me, sir. You moved me out physically but you didn't cut my links. This is my organization, sir. I'm working with them.

\*　\*　\*　\*　\*　\*

(Exhibit D–225(a), pages 21–23).

GCW: I'm talking about what has happened within the last month. You have referred . . .

Cleo: I'm repeating.

GCW: . . . to other employees about another employee's being a homosexual.

Cleo: Your're wrong. I didn't say this. I say, in all probability. And it was what down they informing me. For this reason I wanted to move out and for this reason you saw me fighting like a fish in a net. Go out. What is my life?

GCW: Cleo, you have been out for over a year and a half. You are doing this, this month, now.

\*　\*　\*　\*　\*　\*

(Exhibit D–225(a), page 30)

GCW: Well, it's more than that, Cleo, and that's why we're in here this afternoon. I mentioned four points and the fifth one I hesitate to mention but I'm going to mention it because *we have mentioned it to you before and we are not psychiatrists, we are not medical people, but just as friend to friend* . . .

Cleo: Yes, sir.

GCW: . . . we have advised you in fact I scheduled a meeting with our Medical Department which you . . . declined to accept and you have ignored our suggestions to get medical and psychiatric help. We feel you need help.

Cleo: Really? This is your opinion sir?

GCW: This is simply my opinion and the opinion of our supervision generally.

Cleo: Really? Why you don't get the other people around me to get a psychia psychiatric help? What is wrong?

GCW: We're discuss discussing you, Cleo.

Cleo: Really, me? I'm discussing you at the same time.

GCW: I . . .

Cleo: We are discussing ourselves, sir. O.K.?

GCW: All right, let me let me answer your question.

Cleo: Yes, sir.

GCW: If you're directing it to me, and I accept your question. Why don't I get psychiatric help instead of you.

Cleo: No.

GCW: Well, if this were anyone else, all right?

Cleo: Yes, because—

GCW: If I was in a position . . .

Cleo: Yes.

GCW: . . . *of suspecting that my supervisor and his supervisor was having people spy on me, all right? If I was felt it necessary to disrupt the people around me by talking about the way the Company had injured me and my problems with the Company and if I felt it necessary to*

*malign my fellow employees by suggesting that they are homosexuals.*

Cleo: You are wrong. I didn't say this.

GCW: . . . I would search out medical help, Cleo.

 \* \* \* \* \* \*

GCW: Could you let me finish, please.

Cleo: And you are men and you should not have done this to a woman. This is what's killing me.

GCW: That is my fourth point and fifth, Cleo. *If you do not take our advice and seek medical treatment or psychiatric treatment, I feel it will be necessary to terminate you.*

Cleo: *Do as you like, sir.*

 \* \* \* \* \* \*

GCW: Everybody, none of the things that I'm talking about here show any disrespect for you. These are actions that you are taking showing disrespect for other people, your supervisor, other supervisors, the people around you, other employees on the third floor.

Cleo: You are wrong, I never . . .

GCW: A disrespect for good judgment, Cleo.

Cleo: Please, bring . . . I'm I'm seven years with Western Electric. Bring someone outside the three boys down who must, I'm scared to death and I suspected of low morality standards for a long time for this reason. It was not my atmosphere and I was trying to move out. Move him out, move these three men out, and Mr. Wilser, you and Mr. Boyd cover it, then, and Mr. Groshans reporting, and I don't have anything else with anybody in the Company.

GCW: I don't know that you're saying, Cleo . . .

(Exhibit D–225(a), pages 40–45) (Emphasis added).

Although Wertz professed not to understand Kyriazi, her meaning is clear and, when read against the proofs of the case, accurate. It is her inarticulate protest that Boyd, Wilser and indeed Wertz himself had moved *her* from the third floor, even though she had been the victim, when instead they should have removed those who had published the indecent cartoon. It is almost Kafkaesque that Kyriazi was deemed in need of psychiatric attention for suspecting that her superiors were secretly acting against her, when the supervisors' own secretly recorded memoranda reveal that they were doing just that.

In sum, it is plain that Western knew since at least early August of 1971, and probably earlier, that Kyriazi intended to sue it. (Exhibit D–87). Indeed, Kyriazi filed her first charge with the New Jersey Division on Civil Rights on August 24, 1971. From at least early July of 1971 and continuously thereafter, Western supervisors, particularly Wertz, Wilser and Boyd, prepared a series of self-serving and often inaccurate memoranda, with an eye to the litigation which they knew was almost certain to come. It is clear that it was their strategy to depict Kyriazi as divisive, disruptive and close to demented. The ultimatum, on October 1, 1971, that she submit to psychiatric care was designed to force her to leave. When, on November 5, 1971, Kyriazi told Wilser that she had already filed charges against Western (Tr. 2358), and when this was confirmed by a co-worker who had seen the letter (Tr. 2358–9), Wilser and Wertz decided to terminate her. Thus, on November 11, 1971, a memorandum (Exhibit D–109) justifying termination was prepared and transmitted to higher officers of Western. This memorandum of justification is a compendium of the memoranda privately prepared by Boyd and Wertz. Indeed, it quotes extensively from Boyd's memorandum of June 15, 1970, explaining the reasons for the transfer of Kyriazi from the third floor to the fifth floor. This memorandum is unfair, one-sided and inaccurate. It mentions nothing of her harassment by male co-workers, her complaints, the obscene cartoon, nor does it refer to Wertz's demand that she seek psychiatric help. The Court finds that Kyriazi has established that she was fired when her employer discovered that she had filed her complaint.

While it is likely that she was about to be fired in any case, and that her supervisors were laying the groundwork for that act, her actual termination was triggered by their discovery of her having filed charges.

After her termination Kyriazi found other work. First she joined the Child Development Department of the Human Resources Administration of the City of New York. Her former supervisors, including a former Assistant Commissioner, appeared and testified on her behalf and gave an extremely favorable account of her employment history with their agency. From there Kyriazi went to Group Health, Incorporated, as a systems analyst. The President of that company, Dr. George W. Melcher, who is also an Associate Professor of Clinical Medicine at Columbia University, College of Physicians and Surgeons, testified as to her performance with his company. He testified not only to her exceptional professional competence, but also to her lack of any aberrant personality manifestations which he, as a doctor, would feel required psychiatric treatment or evaluation. Unless we are to believe that Kyriazi became a totally different person when she left Western, the praises given her by subsequent employers both as to her competence and personality are further evidence which discredits the testimony adduced by Western.

It may be appropriate at this point to note that the Court does not mean to suggest that Kyriazi was a paragon of virtue, nor that she was an easy-going person, nor one possessed of a pleasing personality. Far from it. Having observed her on the stand for many hours, the Court came to the conclusion that she is a determined, demanding and insistent person, and the Court does not doubt that her personality has the capacity to thoroughly infuriate those who deal with her. The militant qualities of her character undoubtedly, and understandably, provoked strident responses. If her aims had been illegitimate, her goals impermissible or her complaints without merit, her summary dismissal, on November 19, 1971, and her physical removal on thirty minutes notice would have been understandable. But the fact remains that her protests were over real and not imagined wrongs, and that she had every right to remain steadfast and to refuse to bow or even to bend. It often happens that progress and victories in the struggle for human rights are made by those who are strong enough to endure the struggle. A weaker, more pleasant, less demanding person than Kyriazi might well have capitulated some principle, and survived at Western. But the law does not impose such a duty on anyone.

One last aspect of Kyriazi's individual case remains: her claim that while at Western her supervisors unfairly and discriminatorily rated her, denied her raises and withheld promotions from her. This subject leads us to the edge of a consideration of damages, which the Court will reserve for the second stage of trial.

Kyriazi claims (Pltf's Pr. Finding No. 316), and the Court agrees, that Imandt improperly rated her work "C". We have already found that, at least in part, Kyriazi desired and finally obtained a transfer from Imandt's department because of his discriminatory attitude.

Kyriazi also claims that from the time she entered Wertz's department, in early 1969, until the time she was fired, in late 1971, she was improperly rated. In December of 1969, when Kyriazi received her rating, she was placed at the bottom of the "B" group. (Exhibit P–154, 12/1/69). In 1970 Kyriazi was told that she was rated B+. Western denies she was ever so informed, and on the June 1, 1970 appraisal sheet rates her a "C". Within a month, however, and after her protests, this rating was changed to "B+".

Rating is a critical factor in determining salary at Western. A professional employees' salary is determined by the rating of an employee and the age or length of service of that employee. The evidence established that Wertz, Wilser and Boyd rated Kyriazi lower than her worth, and moreover, that even under Western's own computation, she did not receive the salary to which her age and unduly low rating would have entitled her.

As to the first matter, it is most difficult for the Court, years later, to fix with precision the grades which Kyriazi should have received in 1969, 1970 and 1971. She claims to have been an "A". The company claims she was a "C", but surely never more than the bottom of the "B's". The rating of an employees' work is largely subjective; it rests almost entirely on the impressions of supervisory personnel. Where the evidence indicates that supervisors are conscientiously and fairly attempting such evaluations, their conclusions are entitled to great weight. Subjective perceptions will vary. A perfect evaluation is not required, even if it were attainable.

But when, as here, an employee has demonstrated that her supervisors were unlawfully discriminating against her, then their ratings and rankings are no longer presumptively valid. It falls upon them, in such circumstances, and upon their employer, to demonstrate the *bona fides* of low rankings awarded by supervisors with a demonstrable bias. No satisfactory evidence in support of the Wertz-Wilser-Boyd evaluations of Kyriazi was offered to the Court by Western.

Kyriazi did offer evidence, which the Court finds persuasive, that even under the improperly low ratings awarded by Western, Kyriazi did not receive the salary to which she was entitled. The Court adopts plaintiff's Proposed Findings Nos. 358–360, 366–376:

358. . . . During the period that Kyriazi was at Western, new salary curves for professional employees were published approximately every six months. The salary curve for Information Systems Staff Member, for December 1970, is approximated below (Exhibit P–154):

359. On the curve, employees can plot what their salary should be. The horizontal axis represents the employee's age, and the vertical axis represents amount of monthly salary and rating. The cross-hatched portion of the graph is the range in which the middle 50% employees, that is, those who are rated "B", or "above expected", should be paid. Employees rated "A" should be paid in a range above the cross-hatched portion.

360. Thus, in December 1970, when Kyriazi was 41 years old, and was rated at the top of the B's (or B+) (Exhibit P–154), she could plot her age and rank on the salary curve, and find that her salary should have been approximately $1,345 per month (Kyriazi, 20: 2338); (Exhibit P–154). In fact, her salary at that time was $1,175. (Exhibit P–153). Even accepting *arguendo* the rating given to Kyriazi by Western, Kyriazi was underpaid by Western's own standards (Kyriazi, 21: 2409; (Exhibits P–154, P–91(c)(3), (4)).

366. Kyriazi appears as the top-ranking B on the appraisal sheet for 11/1/70 (Exhibit P–154, Rank Order 11/1/70). In December 1970, she was given an $80 increase, so that she was paid $1,175, substantially below the approximately $1,345 per month she should have been paid according to age and rating (Kyriazi, 21: 2410); (Exhibit P–154).

367. Other Information Systems Members were all paid in accordance with their age and rating at the time of the December increases of 1970. The person with the greatest discrepancy was Kyriazi (Kyriazi, 21: 2409); (Exhibit P–154, Rank Order 11/1/70).

368. Western has a policy of giving generous merit increases to persons who are not paid according to their rating and age (see proposed finding 365, *supra*). Despite the fact that Kyriazi's salary was more out of line than any of the other Information Systems Members, Kyriazi received a smaller raise in December 1970, than six of the males who were rated lower than she, including Armstrong and Liu (Exhibit P–154, Rank Order 11/1/70).

369. Western's policy of bringing a person's salary into line with their rating and age within one year (if not within six months) (see proposed Finding 365, *supra*) was not applied to Kyriazi. In June 1971, Kyriazi received no increase at all (Exhibit P–154, Rank Order 11/1/70).

370. When she complained to her supervisor, defendant Wilser, that others had received raises in June (Sen and Havalchak) while she hadn't, Wilser told her that she was wrong, that nobody received an increase in June, that she was crazy, and that she should have a medical or a psychiatric examination. (Kyriazi, 21: 2445); (Exhibits P–157, P–158).

371. In fact, Sen and Havalchak (Kyriazi, 21: 4444) both received substantial merit raises in June 1971. (Exhibits P–142, P–148).

372. Wilser later claimed that to his knowledge there was no one who got an increase in June who had on the preceding December unless they were out of band (Exhibit D–225(a), p. 32). Out of band means being paid at a lower lever than you should be based on rating and age (Boyd, 29: 3592–3); Exhibit P–91(c)(3)).

373. Neither Havalchak nor Sen was "out of band" the preceding December, and both had received raises at that time, or shortly before. Havalchak received a $75 increase in December 1970 for a total monthly salary of $1,125 (Exhibit P–154, Rank Order 11/1/70). He was 24 years old at the time (Exhibits P–142, P–154). Sen received a $70 increase on 11/1/70 which brought his monthly salary to $1,080. He was 23 years old at the time (Exhibit P–148). Thus, prior to June 1, 1971, Sen and Havalchak would have been placed approximately in the middle of the B band (Sen—$1,080, Havalchak—$1,125). (Exhibit P–154, Rank Order 11/1/70).

374. Using the salary curve of 12/1/70, and plotting the location of Sen and Havalchak on the curve by salary and age, it

is found that their June raises put them at the very top of the B range. This is in spite of the fact that in the relevant ranking, those of 11/1/70 (Exhibit P–154, Rank Order 11/1/70), Sen was ranked the lowest of all Information Systems Members in the B range, and Havalchak was rated N.

375. Thus, in June of 1971, Sen, Havalchak and Kyriazi were situated as follows:

| | Age | Rating * 11/1/70 | Prior Job Related Experience | Advanced Degrees | Experience With Western | Salary |
|---|---|---|---|---|---|---|
| Sen | 24 | B– | 0 | 0 | 1 yr. 2 mths. | 1,160 |
| Havalchak | 25 | N | 0 | MBA | 1 year | 1,170 |
| Kyriazi | 42 | B + | 5 yrs. | MBA, MA in Industrial Engineering | 6 yrs. 2 mths. | 1,175 |

(Exhibits P–142, P–148, P–153, P–156).

* B + is used to denote the top of the B range; B– represents the bottom of the B range.

---

376. Armstrong, who was ranked below Kyriazi in the Rank Order of 11/1/70 (Exhibit P–154) received a salary increase of $125 per month (as compared with Kyriazi's $80 increase) which, in terms of the salary curve, meant that he moved from the bottom of the B range to the top of the B range in one six-month period. Therefore, in December 1970, his salary reflected his age and rating, whereas Kyriazi, after the December 1970 increase, was still earning $170 a month less than she should have been, or almost $2,000 per year less than Western's won [sic] stated policies would mandate.

However, the Court will not now attempt to fix the rating and rank or salary which Kyriazi should have received while at Western. For although the case was bifurcated only as to the class, the Court has determined to defer the question of the appropriate amount of damages to the second stage of trial. Thus, these determinations will abide the second stage of trial.[26] Suffice it for now to hold that Kyriazi has successfully proved in her individual case that Western violated Title VII by (1) underrating and underpaying her, (2) by denying her promotions, and (3) by terminating her.

## XIII. PROPRIETY OF KYRIAZI'S REPRESENTATION OF THE CLASS

Throughout this litigation Western has challenged Kyriazi's right to represent so broad a class. Western, with some merit, points to the disparate jobs and categories which are embodied within the class as certified: from secretaries to wirewomen; from benchhands to engineers. It is true that the class is a very large one. While it has been impossible, because of layoffs and rehirings, to determine the precise number of women who comprise the class, it appears that Kyriazi represents approximately 7,500 women.

Western claims that because Kyriazi's injuries are different from those she invokes on behalf of the class, she cannot satisfy the case or controversy requirement of Article III. Western argues that both Article III of the Constitution and Rule 23 of the Federal Rules of Civil Procedure prohibit a female engineer, whose own claims are limited to discrimination in promotion, salary and termination, from challenging West-

---

**26.** Among the types of relief which will be awarded Kyriazi at the second stage are reinstatement, back pay and retroactive benefits.

ern's treatment of its female secretaries, wirewomen, and pieceworkers in such divergent areas as layoffs and participation in job training programs.

 The Court does not agree with Western that the propriety of class representation is a question of standing under Article III. It is clear that Kyriazi, an "aggrieved party" within the meaning of 42 U.S.C. § 2000e–5, possesses the requisite injury-in-fact to permit her to sue. *See, Hackett v. McGuire*, 445 F.2d 442 (3rd Cir. 1971). The question of what claims may be raised by a named plaintiff is not a question of standing as such; indeed, it is the purpose of a class action to permit a named plaintiff to raise the claims of non-parties. Rather, the question whether the claims of the named plaintiff are sufficiently representative of those of the class bears both on the fairness of compelling a defendant to defend those claims and the fairness of binding the class to the ensuing judgment. *See, Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). These precise concerns are embodied within Rule 23(a) of the Federal Rules of Civil Procedure and it is against the requirements of that rule that we must measure the propriety of Kyriazi's representation of the class.[27]

The requirements of Rule 23 were recently considered by the Supreme Court in *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). In that case, three Mexican-Americans challenged their employer's practice, pursuant to a collective bargaining agreement, of requiring city drivers to forfeit their seniority in order to transfer to more desirable positions as line drivers. Alleging that they had been denied transfers because of their national origin, but stipulating pre-trial that they had not been discriminated against when they were first hired, plaintiffs initially sought to represent a class consisting of all "Negroes and Mexican Americans who had been denied equal employment opportunities with the company because of their race or national origin," including applicants of such minority groups who had sought positions from the effective date of Title VII. *Id.*, at 399, 97 S.Ct. 1891.

Despite their class allegations, plaintiffs never sought class certification. The district court ruled against them on the merits and dismissed their class allegations. The Fifth Circuit reversed, itself certified a class, and went on to find class-wide liability.

The Supreme Court reversed the Fifth Circuit, holding that plaintiffs were not proper class representatives. First, the Court looked to the trial court's finding that plaintiffs themselves were not qualified to become line drivers and the stipulation pre-trial that they had not been discriminated against in their initial hire, and held that since it was clear that the plaintiffs "could have suffered no injury as a result of the alleged discriminatory policies" they "were hardly in a position to mount a class-wide attack on the no-transfer rule." *Id.*, at 403–4, 97 S.Ct. at p. 1897. Second, the Court held that plaintiffs' failure to pursue the class aspects of the case combined with evidence of record that union members had recently ratified the no-transfer rule, made it unlikely that plaintiffs could "fairly and inadequately protect the interests of the class." *Id.*, at 405, 97 S.Ct. at 1897, *quoting* Rule 23.

The instant class was certified under Rule 23(b)(2), which provides that in addition to the requirements of Rule 23(a) the named plaintiff must show that:

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . .

---

**27.** Rule 23(a) provides that:

> *(a) Prerequisites to a Class Action.* One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative party are typical of the claims or defenses of the class, and (4) the representatives will fairly and adequately protect the interests of the class.

We do not have that situation before us. It is clear that Kyriazi, unlike the plaintiffs in *Rodriguez*, has suffered the same injury as that suffered by the class. Further, it is clear that she has adequately pursued the class claims at all stages of this litigation and, indeed, that she has proved them. The only question then is whether Kyriazi's claims are so dissimilar to those raised on behalf of the class that Western was prejudiced by having to defend them.

There clearly is some division of authority on the extent to which a plaintiff, who has been injured in one respect by an employer's discriminatory policies, may by way of a class action challenge employer's practices "across-the board". However, numerous district courts have certified such "across-the-board" actions and, indeed, many Courts of Appeals have held that it is an abuse of discretion for a district court not to do so. One such case is *Rich v. Martin Marietta Corp.*, 522 F.2d 333 (10th Cir. 1975). In that case, the named plaintiffs, who were or had been employed by the defendants as engineers, janitors and electricians, charged discrimination with respect to promotion. One of the named plaintiffs was Hispanic, the rest were black, and all but one were male. They sought pre-trial to represent a class of "all females, Blacks and Hispano-Americans" who presently were or who might in the future be employed by the defendant. The district court refused to certify the class as requested, and instead certified four subclasses consisting of employees within the same job categories and minority groups as the named plaintiffs. The Tenth Circuit reversed, holding that the district court erred in refusing to permit the plaintiffs to bring an across-the-board challenge with respect to all of the defendant's discriminatory employment practices in all of its job categories:

> [T]he class was reduced to those individuals only who were of the same race or ethnic origin and who performed the same jobs . . .

Class actions are generally appropriate in Title VII employment discrimination cases. The reason for this is that although these suits are self-help, so to speak, actions, they also have a broad public interest in that they seek to enforce fundamental constitutional principles . . . [citations omitted] . .

> *The courts have made clear that in the design of these classes not every member of the class need be in an identical situation as the named plaintiff . . .*

In the case at bar as in some of the other cases cited, the plaintiffs made a broad scale attack on the defendant's employment and promotion policies. Their complaint extended beyond challenging the promotional practices in their own departments and alleged the promotional policies throughout the plant had a discriminatory effect. *To the extent, therefore, that employees throughout the plant of Martin Company were discriminated against as a result of the company's policies, the plaintiffs made claims which embraced other people regardless of whether they were engaged in work identical to that of the plaintiffs.*

*Id.*, at 340—1. (Emphasis supplied).

*See also, Barnett v. W. T. Grant*, 518 F.2d 543 (4th Cir. 1975) (district court erred in limiting plaintiff to proof that defendant discriminated against black applicants for position of "over-the-road driver" where plaintiff was prepared to prove discriminatory recruitment practices and failure to hire blacks into supervisory positions); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3rd Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975) (former employee not entitled to reinstatement may represent class which includes present employees); *Long v. Sapp*, 502 F.2d 34 (5th Cir. 1974) (discharged minority employee may represent minority applicants as well as present and former employees of the defendant); *Johnson v. Georgia Highway Express*, 417 F.2d 1122, 1124–5 (5th Cir. 1969) (noting that "the Damoclean threat of a racially discriminatory policy hangs over the racial class [and] is a question of fact common to all members of the class"). *See also*, Schlei and Grossman, *Employment*

*Discrimination Law* at 1095 (1976) noting that "[t]he common question of fact and law . . . is the existence of discrimination", and cases cited at *Id.*, 1089, note 25.[28]

Western relies on *Valentino v. U. S. Postal Service*, 16 F.E.P. Cases 242 (D.D.C. 11/18/77), in which a district court refused to permit a female professional employee to bring a class action on behalf of tens of thousands of women employed in over 4,000 separate jobs within the United States Post Office, "regardless of the location of the jobs." (p. 244). In denying class certification, the court noted that the nature and theory of plaintiff's claim were essentially different from that of the class—she sued on a theory of disparate treatment or intentional discrimination as to her—while she alleged a theory of disparate impact on behalf of the class. The court said:

> Plaintiff's individual complaint here is that she was not promoted because of her sex notwithstanding her qualifications. This essentially is a claim of disparate treatment. It is therefore different from a claim another woman might have that she encountered discrimination through the disparate impact of a general Postal Service employment practice that more harshly treats women than men. The different evidentiary burdens in the two kinds of claims negates a finding of typicality. *Id.* at 244. (footnotes omitted).

While it is of course true that, as a professional employee—an engineer—Kyriazi did not have the identical experiences as the woman factory and clerical workers whom she represents, this does not mean that she fails to satisfy the typicality requirement of Rule 23, FRCivP. For it is clear to the Court that the discrimination suffered by Kyriazi was typical of the discrimination suffered by all women at Western. The Requisition for Personnel forms were used by supervisors who, like defendant Wertz, presided over men and women in broad range of job categories, from engi-

neers to clericals. It is plain, then, that Kyriazi's claim of intentional discrimination is indeed typical of the class claim that Western intentionally discriminated against all of its female employees.

It should also be remembered that, in the largest sense, it is particularly apt for this plaintiff to represent, here, a class as broad as that she championed even while she was an employee at Western. It is evident that while at Western Kyriazi complained to her superiors concerning not only the treatment she was receiving, but the treatment which *all* women received at Western. That this annoyed her supervisors is clear. Indeed, during the October 1, 1971 tape-recorded interview between Kyriazi, Wilser and Wertz, Kyriazi was berated by Wertz for her activities on behalf of "women's lib." (Exhibit D–225(a), page 17). Kyriazi saw herself as a victim of a plant-wide discriminatory policy; she continually protested against it and was fired, in part, because of it. It is not unfitting, therefore, that she be permitted to press that same claim here.

Nor is it clear just how Western has been prejudiced. Much of the same evidence, such as the personnel forms which were used for *all* job categories, the evidence of their alteration, the perjury of those who altered them, the discriminatory advertising, and much more, would have to be proved over and over again if separate classes were formed for every different kind of job at Western. And how many classes would be appropriate? Western has not indicated the number it thinks appropriate. While none of these factors, of course, permits us to overlook the requirements of Rule 23, we should not strain to read that Rule to require women who have been deliberately discriminated against on a plant-wide basis to sue and sue and sue again in order to obtain a full measure of relief. If one were ill disposed to such suits it would, no doubt, be possible to say that Kyriazi can only represent a class of women engineers, with two advanced degrees, who were im-

---

**28.** To be sure, there is authority to the contrary. *See, e. g., Jacobs v. Martin Sweets Co.*, 550 F.2d 364 (6th Cir.), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977); *Cooper v. Allen*, 467 F.2d 836 (5th Cir. 1972).

migrants from Greece, for no one else is similarly situated or "typical". The Court, however, continues to feel that, on the facts of this case, it was correct in certifying the class as broadly as it did, and adheres to its pre-trial and mid-trial rulings for the reasons expressed then as well as now.

Accordingly, the Court finds that plaintiff has established that Western discriminated against plaintiff's class in hiring, in promotional opportunities, in participation in training programs in supervision, in layoffs and in discharge. The Court further finds that as a result of this discrimination within Western, women tended to be and were confined within certain types of jobs and levels of jobs.

As to the remaining claims on behalf of the class, the Court finds that plaintiff has failed to demonstrate, by a preponderance of the evidence, that females at Western were discriminated against with respect to maternity leave, college tuition refund benefits, or participation in the Bell System's Savings Plan. There is simply no credible evidence to support these latter claims. Indeed plaintiff's post-trial Proposed Findings of Fact and Conclusions of Law themselves largely ignore these latter claims. To the extent that women are ineligible to participate in the Bell System's Savings Plan because only salaried employees are eligible and a majority of women employees are not "salaried" but "hourly" employees, this is a collateral consequence of the other discriminatory policies of Western, and will be adjusted by the Court in the remedy phase of the case.

## XIV. KYRIAZI'S REMAINING CLAIMS

In addition to her Title VII claims against Western, Kyriazi claims that (1) Western and the five individual defendants conspired to deprive her of her federally-protected rights in violation of 42 U.S.C. § 1985(3), and (2) that the five named individuals tortiously interfered with her employment at Western.

### A. Kyriazi's § 1985(3) Claims

A unanimous Court of Appeals for this Circuit, sitting *en banc*, has recently held that 42 U.S.C. § 1985(3) is available to an individual who claims to have been discharged in retaliation for his advocacy of equal employment rights. *Novotny v. Great American Federal Savings & Loan Assoc. et al.*, 584 F.2d 1235 (3rd Cir. 1978) (*en banc*).

Specifically, the court held that (1) under the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), discrimination against women constitutes "class-based animus"; (2) that Title VII is a law which guarantees "equal privileges and immunities" within the meaning of § 1985(3); and (3) that a corporation can be deemed to have conspired with its own employees in violation of § 1985(3). The court further noted that:

[T]o deprive members of a class founded on gender of equal protection or equal privileges and immunities without any justification is to act in an irrational and odious manner . . .

*Novotny, supra,* at 1243.

The elements of a cause of action under § 1985(3) were set forth by the Supreme Court in *Griffin*, where the Court stated that:

To come within the legislation a complaint must allege that the defendants did (1) 'conspire . . .' (2) 'for the purpose of depriving . . . any person . . . of the equal privileges and immunities under the laws . . .' (3) did, or caused to be done 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'

*Id.,* 403 U.S. at 102, 91 S.Ct. at 1798. It is clear that Kyriazi has established the existence of a conspiracy among Western and the five named individual defendants to deprive her of her federally-protected right to be secure from employment discrimination on the basis of sex. She has proved,

and the Court so finds, that her co-workers Armstrong, Liu and Snyder jointly agreed to ridicule and harass her as a woman; that her supervisors Wilser and Boyd tacitly encouraged this conduct by deliberately choosing to overlook it; and that Western, through its agents, was a party to and carried out the object of the conspiracy, which was ultimately the termination of Kyriazi.

### B. Kyriazi's State Law Claim

Kyriazi has alleged and proved a pattern of conduct on the part of her co-workers and supervisors which amounts to a tortious interference with her employment contract with Western.

■ Where one intentionally acts to deprive another of an economic benefit, including an employment relationship, the law of New Jersey confers a right of action on the party aggrieved. Thus, in *Brennan v. United Hatters of North America, Local No. 17*, 73 N.J.L. 729, 65 A. 165 (Ct. of Errors and Ap's 1906), plaintiff alleged and proved at trial that the defendant union, of which he was a member, maliciously and without reasonable cause, served him with charges of an alleged violation, revoked his membership in the union, and, thus, prevented him from engaging in his trade. The court affirmed the verdict on behalf of the plaintiff, noting that "[t]he common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction from his fellow man . . ." 73 N.J.L. at 742, 65 A. at 170. More recently, in *Raymond v. Cregar*, 38 N.J. 472, 185 A.2d 856 (1962), New Jersey's highest state court found such a cause of action in favor of a physician who claimed to have been denied reappointment as a hospital physician because of the actions of his colleagues at the hospital. The court there isolated the elements of such a clause of action as consisting of (1) actual interference with an employment relationship which is (2) done with malice, that is, "the intentional doing of a wrongful act without justification or excuse." 38 N.J. at 480, 185 A.2d at 860. *See also, Harris v. Perl*, 41 N.J. 455, 197 A.2d 359 (1964); *Kuzma v. Millinery Workers Union, Local 24*, 27 N.J.Super. 579, 99 A.2d 833 (1953); *Strollo v. Jersey Central Power & Light*, 20 N.J.Misc. 217, 26 A.2d 559 (1942); Prosser, *Torts* § 129 (4th Ed.)

■ The Court is satisfied that Kyriazi's proofs at trial entitle her to recovery under the tort of malicious interference with her employment at Western. There is no need to find the facts a second time. The findings made in connection with her Title VII claim establish the deliberate tortious interference by Wilser, Boyd, Armstrong, Snyder and Liu with her employment relationship with Western.

Accordingly, compensatory and punitive damages will be awarded Kyriazi in an amount to be fixed by the Court at a later time. However, in holding that she is entitled to recovery on her 1985(3) claim and on her state law claim as well as on her Title VII claims, we do not mean to suggest that she is entitled to a double or triple recovery. Rather to the extent that compensatory damages have already been awarded under any of the claims, they are to be recovered only once. Punitive damages, on the other hand, are of course to be determined as a separate matter.

Judgment as to class liability shall be entered for plaintiff in accordance with the decision of this Court. Relief to be granted to the class, including injunctive relief, affirmative action, and a method to compute the amount of back pay which will be awarded to the class pursuant to 42 U.S.C. § 2000e–5(g) shall be determined at a later stage. Defendants shall pay to counsel for plaintiffs all reasonable attorneys' fees, expenses and costs for these proceedings culminating in the judgments as to liability, 42 U.S.C. § 2000e–5(k). Counsel for plaintiff may submit an itemized accounting in relation to Phase I, governed by the principles laid down in *Lindy Bros. Bldrs. Inc. of Philadelphia v. American R. & S. San Corp.*, 487 F.2d 161 (3rd Cir. 1973); 540 F.2d 102 (3rd Cir. 1976). Upon the filing and serving

of the appropriate affidavits the defendant shall have twenty (20) days thereafter to file any objections to any claim. Upon receipt of such objections, or if there be none, the Court will award such fees and expenses and costs as are just.